## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| MYLISSA FARMER, | ) Case No. 2:24-CV-02335 |
| Plaintiff, | ) |
| vs. | ) |
| THE UNIVERSITY OF KANSAS HEALTH SYSTEM AND THE UNIVERSITY OF KANSAS HOSPITAL AUTHORITY, | ) <u>JURY TRIAL DEMANDED</u> |
| Defendants. | ) |

## <u>COMPLAINT FOR DECLARATORY RELIEF AND MONETARY DAMAGES</u>

Plaintiff Mylissa Farmer ("Plaintiff" or "Ms. Farmer"), by and through counsel, brings this action against Defendants the University of Kansas Health System and the University of Kansas Hospital Authority ("Defendants," or collectively, "the University of Kansas Hospital" or "TUKH") for violations of the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd *et seq*., and the Kansas Act Against Discrimination (KAAD), K.S.A. § 44-1001 *et seq*., and demands a trial by jury. In support of her Complaint, Ms. Farmer alleges and states the following:

## <u>PRELIMINARY STATEMENT</u>

1.      Congress enacted EMTALA in 1986 to ensure that *everyone* who comes to an emergency department at a Medicare-funded hospital can access the emergency care they need. In 1989, Congress amended the statute to clarify and extend protections for pregnant people, and the statute's plain text requires emergency departments to provide stabilizing treatment to pregnant individuals in labor, pregnant individuals who have emergency conditions unrelated to labor, and individuals who need emergency treatment

to prevent or manage pregnancy loss. For some pregnant individuals experiencing a medical emergency, including prolonged miscarriages where the pregnancy is nonviable but fetal cardiac activity remains, the necessary stabilizing treatment is terminating the pregnancy in a medical setting, where healthcare providers can guard against the risks of infection, hemorrhage, and stroke (among others).[1] Because studies show that at least one-third of pregnancies involve emergency room visits,[2] and up to 15% of pregnant people suffer a life-threatening condition during the first trimester,[3] EMTALA's safeguards are critical for everyone who can become pregnant.

4.      In addition to EMTALA's guarantee of emergency medical treatment, Kansas law further mandates that no person may be subject to discrimination in a public accommodation because of their sex, including pregnant women who seek emergency care from a hospital that purports to serve the public. Kan. Stat. § 44-1009(c).

5.      Notwithstanding these legal protections, on August 2, 2022, Defendants refused to provide *any* care to Ms. Farmer when she arrived at TUKH's emergency department with an emergency medical condition. That morning, Ms. Farmer had experienced preterm premature rupture of membranes (PPROM) nearly 18 weeks into her pregnancy. In other words, her water had broken—and far too early. By the time Ms. Farmer arrived at TUKH, she had been evaluated and it was clear that she had lost all her amniotic fluid, and her pregnancy—which she had dreamed of and longed for—was no longer viable. And unless she received immediate medical intervention to end the

---

[1] Brief of Am. Coll. of Obstetricians & Gynecologists et al. as Amici Curiae in Support of Respondent, *Moyle v. United States*, Nos. 23-726 & 23-727.
[2] Saloni Malik et al., *Emergency Department Use in the Perinatal Period: An Opportunity for Early Intervention*, NAT'L LIBRARY OF MED. (Aug. 12, 20217), https://pubmed.ncbi.nlm.nih.gov/28811121/.
[3] Glenn Goodwin et al., *A National Analysis of ED Presentations for Early Pregnancy and Complications: Implications for Post-Roe America*, NAT'L LIBRARY OF MED. (Aug. 2023), https://pubmed.ncbi.nlm.nih.gov/37245403/.

pregnancy in a medical setting, she was at risk of severe blood loss, sepsis, loss of fertility, and death. While Ms. Farmer was clearly in the midst of a complicated and dangerous miscarriage—and there was no chance her fetus could survive—the care she needed was an abortion because fetal cardiac activity was still detectible.  Ms. Farmer was entitled to this emergency abortion care under state and federal law.

6.     Ms. Farmer arrived at TUKH heartbroken, in pain, and terrified for her life, but believing that the medical professionals in TUKH's emergency room would provide her with the care she needed, as they were legally required to do. Instead, TUKH refused to perform even routine emergency checks, such as taking Ms. Farmer's temperature and assessing her pain. And though TUKH doctors confirmed both the non-viability of Ms. Farmer's pregnancy and the grave risks she faced if she did not receive emergency abortion care, they turned her away with no treatment whatsoever—not even antibiotics or Tylenol. Two days later, Ms. Farmer finally obtained the life-saving abortion she needed from a clinic in Illinois, but by then, her prolonged miscarriage had already caused extensive damage to her health.

7.     TUKH deserted Ms. Farmer in her time of crisis notwithstanding that its own guidelines required physicians to offer emergency abortion care to patients in Ms. Farmer's circumstances. Consistent with those guidelines, TUKH provided abortion care to another PPROM patient just three weeks before Ms. Farmer's ordeal. But because, by tragic coincidence, Ms. Farmer happened to arrive at TUKH on the evening of the 2022 election determining the future of abortion rights in Kansas, and because the emergency treatment Ms. Farmer required was an abortion, TUKH chose to deviate from its own clinical standards. The hospital determined that treating pregnant patients like Ms. Farmer

3

that evening would be too "risky" in the "heated" "political" environment, notwithstanding the danger to those patients' lives and health. TUKH's decision to single out pregnant patients, and pregnant patients alone, to be denied critical emergency care it was clearly competent and legally required to provide not only ran afoul of EMTALA; it was facial sex discrimination in violation of the KAAD.

8.     TUKH's illegal and discriminatory treatment of Ms. Farmer compounded the trauma of her pregnancy loss and denied her the ability to mourn that loss on her own terms. She continues to suffer physical, emotional, and financial harm resulting from TUKH's unlawful actions.

9.     On May 1, 2023, the U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS") found that TUKH violated EMTALA when it refused to provide emergency abortion care to Ms. Farmer. CMS determined that terminating Ms. Farmer's pregnancy in a medical setting was in fact the stabilizing treatment she required. But TUKH turned Ms. Farmer away, in plain violation of EMTALA.

10.     Plaintiff therefore brings this case to hold TUKH accountable for its willful disregard of federal and state law and to obtain some measure of relief for the harm she has suffered.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over Plaintiff's EMTALA claim under 28 U.S.C. § 1331, as this claim arises under the laws of the United States and thus presents a federal question.

10.     This Court has supplemental jurisdiction over Plaintiff's KAAD claim under 28 U.S.C. § 1367, because all of Plaintiff's claims are part of the same case or controversy.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in Kansas, and Defendants have their principal place of business in Kansas.

## PARTIES

12.     Plaintiff Mylissa Farmer was formerly a citizen and resident of Missouri and has since moved out of state.

13.     Defendant the University of Kansas Health System is a health system based in Kansas that is governed by the University of Kansas Hospital Authority. Its main hospital campus is located in Kansas City, Kansas. That hospital campus is a Level I Trauma Center offering comprehensive emergency medical services to the public.[4]

14.     Defendant the University of Kansas Hospital Authority is and was at all relevant times a body politic and corporation created pursuant to Kansas statute. *See* K.S.A. § 76-3301 *et seq.* It operates as an independent instrumentality of the state of Kansas with the power to sue and be sued in its own name. *See id.* at §§ 76-3304, 76-3308(a)(4).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

15.     Ms. Farmer filed an administrative complaint with the Kansas Human Rights Commission (KHRC) on December 16, 2022, arguing that TUKH's denial of care amounted to discrimination on the basis of sex in violation of the Kansas Act Against Discrimination. Ms. Farmer amended her complaint on December 28, 2022.

---

[4] *Emergency Services*, THE UNIV. OF KAN. HEALTH SYS.,
https://www.kansashealthsystem.com/care/specialties/emergency-services (last visited July 26, 2024).

16.     During the pendency of the administrative complaint, KHRC did not issue a finding of probable cause or no probable cause, nor did it take other administrative action dismissing the complaint.

17.     On July 15, 2024, more than 300 days after filing her complaint, Ms. Farmer voluntarily dismissed her complaint. K.S.A. § 44-1005(i).

## FACTUAL ALLEGATIONS

18.     In or around June 2022, when Plaintiff Mylissa Farmer first learned that she was pregnant, she was overjoyed. Because of her history of polycystic ovary syndrome and a past miscarriage Ms. Farmer had believed she would never have a baby. She and her now-husband were excited to build a life and a future together for their daughter.

19.     But just prior to 18 weeks into her pregnancy, at approximately 6:30 A.M. on August 2, 2022, Ms. Farmer's water broke, and she experienced bleeding, abdominal pressure, pain, and cramping.

20.     Ms. Farmer called the office of her local obstetrician-gynecologist and was advised to go to the emergency department at Freeman Hospital West ("Freeman"), a healthcare facility close to her home at the time in Joplin, Missouri.

21.     A team of doctors at Freeman determined that Ms. Farmer had experienced previable PPROM, that her cervix was dilated, and that she had lost *all* amniotic fluid. Given her fetus's gestational age, the doctors at Freeman concluded that pregnancy loss was "inevitable." The doctors at Freeman also determined that, given her medical history, waiting to end her pregnancy would put her at risk of "maternal thrombosis," "infection/sepsis," "severe blood loss," the loss of her uterus, and even death.

22.     Despite the serious risks they had identified, the Freeman doctors claimed they were unable to terminate Ms. Farmer's pregnancy, citing Missouri's abortion ban. Ms. Farmer was advised to seek immediate life-saving medical care at an out-of-state emergency department.

**I.     Ms. Farmer Seeks Life-Saving Medical Care at the University of Kansas Hospital.**

23.     Given the substantial, immediate risks to her health and life, Ms. Farmer and her husband hurriedly sought care out of state. They called healthcare providers in Illinois and Kansas. Two Kansas hospitals informed Ms. Farmer that they were not equipped to provide her with the care that she needed, but one of them advised her to go to the main hospital campus of TUKH in Kansas City, Kansas, because it was the nearest large emergency department.

24.     Ms. Farmer and her husband drove three hours to the TUKH emergency department, arriving at or around 11:27 P.M. on August 2, 2022.

25.     Ms. Farmer arrived at TUKH on Primary Election Day 2022, when Kansas voters were asked to decide whether the state constitution should continue to protect abortion access.

26.     Ms. Farmer was taken by wheelchair to a bed in the labor and delivery unit. When she arrived in labor and delivery, she was directed to disrobe in a bathroom. Blood had seeped through her clothes even though she was wearing a sanitary napkin and covered the toilet and the floor when she undressed. Ms. Farmer was so embarrassed at the mess that she apologized to the TUKH obstetrician who was on duty that evening, Dr. Leslie Dunmire.

27.     TUKH documented that Ms. Farmer had a complicated medical history, including deep vein thrombosis (blood clots), an irregular heartbeat, and polycystic ovary syndrome. Hospital staff also noted that Ms. Farmer was of an advanced maternal age of over 35 years of age and that she had a past miscarriage.

28.     Dr. Dunmire performed a physical examination of Ms. Farmer shortly after midnight on August 3, 2022. Dr. Dunmire independently confirmed that Ms. Farmer had experienced PPROM and that her pregnancy was no longer viable. Dr. Dunmire performed a bedside ultrasound and confirmed that Ms. Farmer's pregnancy was anhydramnios— meaning there was no longer any amniotic fluid surrounding the fetus. Upon visual examination, Dr. Dunmire also determined that Ms. Farmer's cervix was dilated. Dr. Dunmire determined that Ms. Farmer was so vulnerable to infection at this time that she did not examine Ms. Farmer digitally or perform a transvaginal ultrasound.

29.     While at TUKH, Ms. Farmer felt her symptoms worsen. Her bleeding was the heaviest it had been since her water broke, her fatigue grew more intense, she experienced mental fog, and she felt acute pain and pressure in her lower abdomen.

## II.     TUKH Maintains Internal Medical Guidelines Pertaining to Emergency Obstetric Care, Including for Patients with PPROM.

30.     TUKH's internal "OB Triage Care" guidelines require hospital staff to perform a pain assessment on emergency obstetric patients and to take a patient's temperature at least once upon presentation to triage.

31.     TUKH's "Prelabor rupture of membranes (PROM) patient care" guidelines ("PPROM guidelines") also require that staff take a PPROM patient's temperature every two hours after the rupture of membranes is determined.

8

32.     TUKH's internal guidelines underscore that PPROM poses a significant and continuing risk to the pregnant individual. According to the hospital's PPROM guidelines, "[t]he risk of complications generally increases the earlier and longer the membranes are ruptured." The guidelines elaborate that PPROM "places the patient and fetus at risk for infections due to the breach of the natural barrier that the amniotic membrane provides as well as the close proximity of vaginal and fecal bacteria. Placental abruption also complicates PPROM, placing the mother and fetus at risk for hemorrhage, hypoxia, and death. Other potential maternal complications include endometriosis and retained placenta."

33.     According to the hospital's PPROM guidelines, when a patient experiences PPROM before viability (*i.e*., 23 to 24 weeks gestation), "[t]he practitioner should explain the risks and benefits of outpatient expectant management and surveillance and offer immediate delivery." If the patient declines immediate delivery, the hospital should offer the patient to "be admitted to an antenatal unit for monitoring for infection and fetal well-being" and receive "antibiotic prophylaxis."

### III.     TUKH Fails to Treat Ms. Farmer in Accordance with EMTALA and Its Own Internal Medical Guidelines.

34.     TUKH's medical staff did not take the measures outlined in its internal guidelines pertaining to patients requiring emergency obstetric care, including for PPROM.

35.     Given the risks to Ms. Farmer's health caused by PPROM and the nonviability of her fetus, Dr. Dunmire initially recommended medical intervention to terminate Ms. Farmer's pregnancy. She told Ms. Farmer that she could either induce labor or perform a dilation and evacuation ("D&E"), a surgical method for ending a pregnancy. Dr. Dunmire recommended inducing labor due to concerns that a D&E would "resemble[]

an abortion." Dr. Dunmire also advised that inducing labor would give Ms. Farmer the opportunity to hold her daughter and say goodbye. Ms. Farmer desperately wanted that opportunity.

36.     Dr. Dunmire's initial medical opinion aligned with TUKH's internal medical guidelines requiring its practitioners to offer to the patient immediate delivery.

37.     Nearly twenty minutes later, however, Dr. Dunmire returned to Ms. Farmer's bedside to inform her that Dr. Dunmire's medical judgment had been overridden, and she could not induce labor because it would be too "risky" in the "heated" "political" environment.

38.     According to Ms. Farmer's medical records, Dr. Dunmire counseled Ms. Farmer about "how quickly she could become ill from chorioamnionitis" (*i.e.*, intra-amniotic infection), but that she could not provide Ms. Farmer with the treatment necessary to prevent such illness due to detectable fetal cardiac activity.

39.     TUKH not only refused to induce Ms. Farmer's labor—the treatment necessary to stabilize her emergency medical condition—it refused to provide her *any* treatment whatsoever.

40.     According to Ms. Farmer's medical records, TUKH staff neither took Ms. Farmer's temperature nor assessed her pain during her time at the hospital.

41.     TUKH did not offer to admit Ms. Farmer to an antenatal unit for monitoring for infection or further deterioration of her health.

42.     TUKH never administered prophylactic antibiotics or pain medication.

43.     Even though transferring Ms. Farmer to another hospital would not have satisfied TUKH's EMTALA obligations, TUKH never even offered to transfer Ms. Farmer to a hospital that would provide her with necessary care.

44.     Instead, TUKH discharged Ms. Farmer at 1:29 A.M. on August 3, 2022, approximately two hours after her arrival. She left in terror and disbelief that her medical team had sent her home without taking a single measure to prevent the possible complications she faced, including a fatal infection, blood clot, or hemorrhage.

## IV.     Ms. Farmer Suffered and Continues to Suffer Extensive Harm Due to TUKH's Denial of Care.

45.     Lacking a better option, Ms. Farmer returned to her local hospital in Joplin, Missouri, where she was admitted for observation as her health continued to deteriorate. Knowing that she needed to travel elsewhere to obtain the life-saving care she needed, she left the local hospital on August 4, 2022.

46.     That day, Ms. Farmer learned that a clinic in Illinois would offer her urgent care if she could travel there by the next morning. At 3:00 A.M. on August 5, 2022, Ms. Farmer woke up with pain in her lower back and abdomen. Nonetheless, she and her husband began a second, lengthy drive out of state, this time to Illinois. By approximately 4:00 A.M., Ms. Farmer was experiencing severe cramping, contractions, and excruciating pain while still on the road. By the time Ms. Farmer arrived at the clinic in Illinois, around 10:00 A.M., she was several days into her miscarriage, in active labor, and nearly fully dilated. Doctors at the Illinois clinic immediately performed a D&E to terminate Ms. Farmer's pregnancy.

47.     Extensive and foreseeable damage had already been done due to TUKH's failure to provide timely, medically necessary emergency care. In the days following the

termination of her pregnancy, Ms. Farmer continued to experience pain and vaginal discharge. She contacted her local obstetrician, who said that Ms. Farmer had likely developed an infection by the time she reached the clinic in Illinois—an infection that prolonged her recovery. Her obstetrician prescribed Ms. Farmer antibiotics. Had TUKH provided the legally required stabilizing treatment, she would not have developed this preventable infection.

48.     Ms. Farmer also suffered the excruciating pain of labor in a moving car because TUKH refused to provide standard medical care. Had TUKH followed its own guidelines and offered "immediate delivery" of Ms. Farmer's fetus, she could have been given medication to speed her labor and control her pain.

49.     TUKH's refusal to provide necessary emergency medical care was also psychologically traumatizing. As Ms. Farmer and her husband drove hours to reach TUKH, she thought it would be her lifeline. Instead, hospital staff told her that, while they had the ability to provide life-saving care, and thought it was necessary, they would not do so. As a result, she then endured hours of agonizing labor in her car, terrified that her miscarriage would not only end her pregnancy but also take her life.

50.     Ms. Farmer continues to suffer physically, psychologically, and financially as a result of her ordeal. Her doctor believes the trauma from the denial of care exacerbated a chronic illness, for which she has been hospitalized several times since TUKH's denial of care.  The psychological and physical manifestations of the trauma Ms. Farmer suffered ultimately prevented her from working for many months. Without the ability to earn wages, Ms. Farmer lost the home she owned.

V.    **The U.S. Department of Health and Human Services Found that TUKH's Response to Ms. Farmer's Medical Condition Was Deficient Under EMTALA.**

51.    On November 8, 2022, Ms. Farmer filed an administrative complaint against TUKH with the U.S. Department of Health and Human Services (HHS) Centers for Medicare & Medicaid Services (CMS) and the HHS Office of Regional Health Operations, Region 7. Ms. Farmer requested that CMS and the Region 7 Office investigate TUKH for its refusal to provide emergency medical treatment, in direct contravention of its federal obligations under EMTALA.

52.    In response to Ms. Farmer's request, CMS launched an investigation into TUKH's conduct, which involved reviewing TUKH's internal medical guidelines and interviewing a number of staff members, including a nurse in the hospital's labor and delivery unit, Dr. Dunmire, one of the hospital's risk management coordinators, and a maternal fetal medicine specialist.

53.    In the course of its investigation, CMS identified a second obstetric patient ("Patient 4") who had presented to TUKH's emergency department with PPROM in her second trimester of pregnancy approximately three weeks prior to Ms. Farmer.

54.    CMS compared Ms. Farmer's and Patient 4's records. Both patients were of advanced maternal age and had prior pregnancies. Ultrasounds confirmed that both patients' fetuses had detectable cardiac activity, despite the rupture of their amniotic membranes. Both patients' fetuses were incapable of surviving outside the womb. And both patients received counseling on the serious risks of PPROM. As with Ms. Farmer, Patient 4 was warned that she would "likely" develop "either chorio (chorioamnionitis) or PTL (preterm labor) with demise due to young gestational age."

55.     However, CMS noted meaningful differences in their experiences with and treatment by TUKH staff. Ms. Farmer's condition appeared to be even more perilous than Patient 4's. While Patient 4 had a decrease in amniotic fluid, Ms. Farmer's ultrasound showed that she had lost *all* her amniotic fluid. While Patient 4's records indicated that she received a pain assessment, Ms. Farmer's reflected none—despite the fact that she experienced "a lot of pain and pressure in lower abdomen" while at TUKH. While Patient 4 denied vaginal bleeding, Ms. Farmer reported vaginal bleeding and cramping. And while TUKH admitted Patient 4 to the hospital and provided her with emergency abortion care, the hospital discharged Ms. Farmer shortly after she arrived.

56.     CMS completed its investigation of TUKH on February 7, 2023 and issued a Notice of Deficiency to the hospital on April 10, 2023. It concluded that, "[b]ased on record review, document review[,] and interview[s]," TUKH "failed to provide stabilizing treatment" for Ms. Farmer, and this failure had "the potential to place patients at risk for deterioration of the emergency medical condition (EMC) causing harm or injury up to and including death."

## COUNT I – EMTALA VIOLATION (SCREENING CLAIM)

57.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

58.     The Emergency Medical Treatment and Labor Act (EMTALA) was enacted in 1986 with the purpose of ensuring that all individuals who present at Medicare-funded hospital emergency departments with an emergency medical condition receive stabilizing care.

59.     EMTALA applies to every hospital that has an emergency department and participates in Medicare. 42 U.S.C. § 1395cc(a)(1).

60.     The University of Kansas Health System participates in Medicare, and its main hospital campus has an emergency department. Therefore, EMTALA applies to TUKH.

61.     Covered hospitals have two primary obligations under EMTALA. Pursuant to the first obligation, they must perform an "appropriate medical screening examination," on "any individual" who comes to the "emergency department" to determine whether the individual has an "emergency medical condition" (the "Screening Requirement"), 42 U.S.C. § 1395dd(a).

62.      One way the Screening Requirement is violated is when a hospital does not follow its own standard procedures for assessing individuals who come to the emergency department.

63.     TUKH's standard emergency procedure, codified in its "OB Triage Care" guidelines, requires a pain assessment for obstetric patients. While Ms. Farmer was in considerable and increasing pain in her lower abdomen, TUKH doctors never performed a pain assessment.

64.     In addition, the TUKH Triage Care and PPROM guidelines require that hospital staff must obtain the individual's temperature upon their presentation to triage and, every two hours after rupture of membranes is determined, and every hour if febrile. Ms. Farmer's medical records do not indicate that TUKH staff checked her temperature to see if she had a fever.

65.     By failing to follow its own standard procedures for assessing individuals experiencing obstetric emergencies, TUKH violated EMTALA's Screening Requirement. As a result, TUKH staff apparently missed Ms. Farmer's signs of early labor.

66.     Ms. Farmer suffered physical, emotional, and financial harm as a result of TUKH's denial of care.

67.     TUKH staff showed gross negligence, if not malice, in its complete failure to provide Ms. Farmer with adequate screening.

68.     Pursuant to 42 U.S.C. § 1395dd(d)(2)(A), Ms. Farmer is entitled to damages available for personal injury under Kansas law, which include monetary, non-monetary, and punitive damages.

## COUNT II – EMTALA VIOLATION (STABILIZATION CLAIM)

69.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

70.     In addition to its Screening Requirement, EMTALA obligates covered hospitals to provide any "individual" that has an "emergency medical condition" with either (a) "such further medical examination and such treatment as may be required to stabilize the medical condition"; or (b) under limited circumstances, a medically beneficial "transfer" to another facility. 42 U.S.C. § 1395dd(b)(1) (the "Stabilization Requirement").

71.     EMTALA defines an "emergency medical condition" (EMC) to include, in relevant part:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>> (ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part. . .

42 U.S.C. § 1395dd(e)(1)(A).

72.     Ms. Farmer's condition upon arrival at TUKH qualified as an EMC.

73.     TUKH was aware that Ms. Farmer had at least one EMC.

74.     Despite Ms. Farmer's EMC, TUKH failed to provide her with stabilizing treatment.

75.     As relevant here, EMTALA defines "stabiliz[ing]" treatment as "such medical treatment of the [EMC] as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A).

76.     TUKH's PPROM guidelines explain that, without medical intervention, patients with PPROM can expect their health to deteriorate. Recognizing that medical intervention is necessary to mitigate this risk, the PPROM guidelines state that practitioners should "offer immediate delivery" to PPROM patients, and if a patient refuses that delivery, the patient should *not* simply be discharged. Rather, the hospital should offer the patient to "be admitted to an antenatal unit for monitoring for infection and fetal well-being" and receive "antibiotic prophylaxis."

77.     Ms. Farmer was not offered immediate delivery—the treatment her obstetrician recommended for her PPROM. Nor was she admitted for monitoring and antibiotics. Instead, Ms. Farmer was discharged from TUKH without *any* treatment whatsoever.

78.     Moreover, even though transferring Ms. Farmer to another hospital would not have satisfied TUKH's EMTALA obligations under these circumstances, TUKH never

offered to transfer Ms. Farmer to another facility that could provide her with the stabilizing treatment she needed.

79.     Because TUKH diagnosed Ms. Farmer with an EMC but failed to stabilize her condition or transfer her to another facility for appropriate care, the hospital violated EMTALA's Stabilization Requirement.

80.     Ms. Farmer suffered physical, emotional, and financial harm as a result of TUKH's denial of care.

81.     TUKH staff showed gross negligence, if not malice, in its complete failure to provide Ms. Farmer with stabilizing treatment.

82.     Pursuant to 42 U.S.C. § 1395dd(d)(2)(A), Ms. Farmer is entitled to damages available for personal injury under Kansas law, which include monetary, non-monetary, and punitive damages.

## COUNT III – KANSAS ACT AGAINST DISCRIMINATION VIOLATION

83.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

84.     As iterated above, on July 15, 2024, more than 300 days after filing her administrative complaint with the Kansas Human Rights Commission (KHRC), Ms. Farmer voluntarily dismissed her complaint. K.S.A. § 44-1005(i).

85.     The Kansas Act Against Discrimination (KAAD) prohibits, among other things, discrimination on the basis of sex in a place of public accommodation. K.S.A. § 44-1009(c).

86.     TUKH is a place of public accommodation because it "caters or offers goods, services, facilities and accommodations to the public." K.S.A. § 44-1002(h).

87.     Ms. Farmer is a member of a protected class under the KAAD because she is a woman who was subject to discrimination on the basis of sex in a place of public accommodation.

88.     As a Level I Trauma Center, TUKH is capable of and has the practice of providing comprehensive emergency care to all those who come to the emergency room. On the night Ms. Farmer came to the emergency room, however, TUKH made a decision to single out one group of people for substandard treatment—those who were pregnant.

89.     Because Ms. Farmer happened to arrive at TUKH on election night, the hospital refused to provide Ms. Farmer with *any care whatsoever* after determining that providing the necessary care would be too "risky" in the "heated" "political" climate. In so doing, the hospital chose to deviate from its own medical guidelines and the medical judgment of its physicians, notwithstanding the threat to the health and lives of their patients.

90.     TUKH's decision to offer all necessary emergency care to everyone except pregnant patients on its face constitutes discrimination on the basis of sex. TUKH willfully, intentionally, and callously discriminated against Ms. Farmer by denying her critical emergency medical care on the basis of her pregnancy-related condition.

91.     Ms. Farmer suffered physical, emotional, and financial harm as a result of TUKH's discrimination.

92.     Ms. Farmer is entitled to damages for pain and suffering up to the maximum amount permitted under K.S.A. § 44-1005(k).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that:

A.      The Court adjudge and decree that the acts of Defendants are illegal and unlawful

pursuant to:

      a.  EMTALA's Screening Requirement as set forth in 42 U.S.C. § 1395dd(a).

      b.  EMTALA's Stabilization Requirement as set forth in 42 U.S.C. § 1395dd(b)(1).

      c.  The KAAD's prohibition of discrimination on the basis of sex in a place of public accommodation. K.S.A. § 44-1009(c).

B.      The Court enter judgment against Defendants and in favor of Plaintiff for the

amount of damages sustained by Plaintiff as allowed by law including punitive damages.

C.      The Court award Plaintiff such other and further relief as the case may require and

the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Pursuant to FED. R. CIV. P. 38(b), Plaintiff demands a trial by jury of all of the

claims asserted in this Complaint so triable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates the place of trial to be Kansas City, Kansas.

July 30, 2024                              Respectfully submitted,


                                           /s/ *Mark V. Dugan*
                                          ─────────────────────────────
                                          Heather J. Schlozman (Kan. Bar No.
                                          23869)
                                          Mark V. Dugan (Kan. Bar. No. 23897)
                                          DUGAN SCHLOZMAN LLC
                                          8826 Santa Fe Drive, Suite 307
                                          Overland Park, KS 66212
                                          (913) 322-3528
                                          Heather@duganschlozman.com
                                          Mark@duganschlozman.com

                                          Alison Deich (*pro hac vice* forthcoming)
                                          Harini Srinivasan (*pro hac vice*
                                          forthcoming)
                                          Aniko Schwarz (*pro hac vice*
                                          forthcoming)
                                          Nina Jaffe-Geffner (*pro hac vice*
                                          forthcoming)
                                          Sabrina Merold *(pro hac vice*
                                          forthcoming)
                                          COHEN MILSTEIN SELLERS &
                                          TOLL PLLC
                                          1100 New York Ave. NW, Fifth Floor
                                          Washington, DC 20005
                                          (202) 408-4600
                                          adeich@cohenmilstein.com
                                          hsrinivasan@cohenmilstein.com
                                          aschwarcz@cohenmilstein.com
                                          njaffegeffner@cohenmilstein.com
                                          smerold@cohenmilstein.com

                                          Michelle Banker (*pro hac vice*
                                          forthcoming)
                                          Alison Tanner (*pro hac vice*
                                          forthcoming)
                                          Kenna Titus (*pro hac vice* forthcoming)
                                          NATIONAL WOMEN'S LAW
                                          CENTER
                                          1350 I Street NW, Suite 700
                                          Washington, DC 20005
                                          (202) 588-5180

mbanker@nwlc.org
atanner@nwlc.org
ktitus@nwlc.org

*Attorneys for Plaintiff*