UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MYLISSA FARMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:24-CV-02335 |
| | ) | |
| THE UNIVERSITY OF KANSAS HOSPITAL AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT UNIVERSITY OF KANSAS HOSPITAL AUTHORITY'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

COMES NOW the University of Kansas Hospital Authority, by and through counsel Trevin Wray and Jaime L. Whitt, and hereby moves to dismiss Plaintiff's complaint (Doc. 1) pursuant to Fed. R. Civ. P. 12(b)(6)[1] for the reasons stated herein.

"It is sufficient, and indeed all that is permissible [under Fed. R. Civ. P. Rule 8], if the complaint concisely states facts upon which relief can be granted upon any legally sustainable basis." *Crump v. Cital Core Health Strategies, LLC*, 2024 U.S. Dist. LEXIS 109739, *6 (D. Kan. June 21, 2024), quoting *Frazier v. Ortiz*, No. 06-1286, 2007 U.S. App. LEXIS 257, 2007 WL 10765, at *2 (10th Cir. Jan. 3, 2007). In this case, Plaintiff's 21-page Complaint abandons that standard completely, opting to make dubious public allegations (presumably to satisfy secondary objectives) that are simultaneously contradictory and self-defeating. Despite the length of the

[1] Defendant UKHA asserts that the failure to plead an adequate basis for the requested relief is dispositive of the claims made in the Complaint, as the initial burden to plead the essential elements of a judgment that could be entered by the Court rests with the filing party. Defendant waives no additional objections, defenses, or arguments on dispositive issues, including Eleventh Amendment immunity. See *Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 542 (10th Cir. 2022), (holding for the first time that the burden of persuasion on the issue of whether the governmental entity is an "arm of the state" will be on the entity asserting immunity.)

Complaint, it ultimately demonstrates that no legal entitlement to relief exists. Dismissal is therefore required.

## LEGAL STANDARDS ON MOTIONS TO DISMISS

The standard used in determining whether a complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) is well-known and well-established. A complaint will survive a motion to dismiss only if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plausibility standard is not identical to a probability requirement, but plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). In conducting its review, a district court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Williams v. Meese,* 962 F.2d 994, 997 (10th Cir. 1991).

While the deferential standard used under Fed. R. Civ. 12(b)(6) liberally construes and assumes as true all *well-pleaded* allegations of fact, it has not been suggested that the standard requires an abandonment of all common sense. Other district court rulings have observed that while reasonable inferences must be construed in favor of the non-moving party, courts are not required to "accept factual claims that are internally inconsistent." *Pesci v. I.R.S.,* 67 F.Supp.2d 1189, 1191-92 (D. Nev. 1999); See also *Anthony Sterling, M.D., v. Provident Life and Accident Ins. Co.,* 519 F. Supp. 2d 1195, 1209 (M.D. Fla. 2007*).*

## REQUEST FOR CONSIDERATION OF MATERIALS REFERENCED IN THE COMPLAINT

It is generally true that submission of matters outside the pleadings will prompt a court to consider whether a motion to dismiss must exclude that evidence or be converted to a motion for summary judgment under Rule 56. If specific documents falling outside the pleadings are directly

referenced in the Complaint, however, the Court may consider the entirety of the document upon submission by a Defendant without converting the motion to a motion for summary judgment. *GFF Corp. v. Assoc. Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384-85 (10th Cir. 1997).

This exception to the rule should apply here, because Plaintiff is not merely making allegations of fact in a direct form, she is explicitly referring to and quoting from secondary sources that she contends will support those allegations. Instead of merely alleging a fact as to the events at issue, for example, Plaintiff expressly references outside documents containing those same allegations, in order to imply that those allegations have been found to have merit. (See, e.g., Doc. 1, para. 56; See also Doc. 1, para. 51, explicitly referencing and quoting from an administrative document.) Since Plaintiff does not just expressly reference these outside materials in her Complaint, she purports to actually quote from those materials, the Court may consider the actual documents, marked as Exhibits 1-5 to this motion, in determining this motion to dismiss under Fed. R. Civ. P. 12(b)(6). *N. Ala. Fabricating Co., v. Bedeschi Mid-West Conveyer Co.*, 2017 U.S. Dist. LEXIS 70152, *11-12 (D. Kan. May 8, 2017).

## <u>STATEMENT OF THE MATERIAL ALLEGATIONS</u>

In accordance with Fed. R. Civ. P. 12(b)(6), the following allegations material to the motion are taken from the Complaint, unless otherwise noted, and no allegation should be deemed admitted at this time.

1. At the time of the events alleged in the Complaint, Plaintiff Mylissa Farmer was a citizen of the State of Missouri. (Doc. 1, para. 12.)
2. Plaintiff asserts that the University of Kansas Hospital Authority is an independent instrumentality of the State of Kansas, created by the Kansas legislature through the enactment of K.S.A. 76-3301, et. seq. (Doc. 1, para. 14.)

3. On July 11, 2022, the Centers for Medicare & Medicare Services ("CMS") division of the United States Department of Health and Human Services ("HMS") issued a letter to "remind" "physicians and hospital" staff…of their "obligations under [EMTALA] in light of new state laws prohibiting or restricting access to abortion." (Exhibit 1.[2])

4. In that correspondence, HHS threatened physicians and hospitals with fines and penalties for failing to provide abortions in situations where it could be considered "stabilizing treatment" for an emergency medical condition, and HHS declared that any state laws restricting abortion must be disregarded if those laws conflict with EMTALA obligations. (Id, p. 4.)

5. The letter further stated that EMTALA would provide any individual physician with a legal defense against any state enforcement of laws restricting abortion in that context. (Id, p. 5.)

6. After the events at issue in her Complaint, Plaintiff filed an administrative complaint with HHS against two hospitals, mirroring the language of the "HHS guidance" and asserting that EMTALA entitled Plaintiff to a surgical abortion as stabilizing treatment for a specific medical diagnosis. (Exhibit 2.)[3]

7. In the administrative complaint submitted by Plaintiff's attorneys to HHS, it is alleged that Ms. Farmer saw her regular OB/GYN physician regarding a known pregnancy on August 1, 2022, seeking standard prenatal care. (Exhibit 2, para. 16.)

---

[2] Plaintiff's Complaint contains a footnote citation to an Amicus Curiae brief filed in *Moyle v. United States*, which was an action filed on behalf of the State of Idaho seeking to enjoin HHS from taking the actions threatened in its July 11, 2022, correspondence. (Doc. 1, n. 1.) In addition, Plaintiff repeatedly references her own administrative complaint to HHS throughout her Complaint filed in this case, and she specifically referenced the HHS "EMTALA guidance" statement within her administrative complaint. (See, e.g., Exhibit 2, p. 23, citing to this document to claim that "CMS has made clear" that stabilizing treatment includes abortion.) The HHS letter itself should be considered as background context for the references the Complaint makes to purported "investigations" by CMS.

[3] See Doc. 1, para. 51, referencing the administrative complaint.

8. Reportedly, that visit resulted in a determination that "everything appeared to be going well." (Id.)

9. At the time of encounter with her OB/GYN physician, Ms. Farmer reported that she "had been taking [an antibiotic] for a tooth infection for a few days." *Id.*

10. As of August 1, 2022, Plaintiff was approximately 17-18 weeks pregnant. (Doc. 1, para. 18-19.)

11. On August 2, 2022, the State of Kansas held a primary election that included a proposed amendment to the Kansas constitution, asking Kansas voters to determine whether legislators may pass laws "regarding abortion" to the "extent permitted by the constitution of the United States." (Doc. 1, para. 25, generally, referencing Kansas Primary Election, August 2, 2022, Question 2.)

12. Plaintiff's Complaint characterizes this vote as determining "whether the state constitution should continue to protect abortion access." (Doc. 1, para. 25.)

13. Plaintiff alleges that at approximately 6:30 a.m. on August 2, 2022, she had a premature rupture of membranes resulting in the loss of her amniotic fluid. (Doc. 1, para. 21.)

14. Plaintiff alleges that she presented to a hospital emergency department in Joplin, Missouri, on the advice of the "office of her local obstetrician-gynecologist," after contacting that provider's office earlier that morning. (Doc. 1, para. 19.)

15. Plaintiff alleges that a "team of doctors at Freeman" made findings that included "inevitable" pregnancy termination, and that "waiting to end her pregnancy would put her at risk" of serious medical complications or mortality. (Doc. 1, para. 21.)

16. Plaintiff claims that "despite the serious risks they had identified," physicians at Freeman Hospital West "claimed they were unable to terminate Ms. Farmer's pregnancy, citing

Missouri's abortion ban," and that those physicians "advised [Ms. Farmer] to seek immediate life-saving medical care at an out-of-state emergency department." (Doc. 1, para. 22.)

17. In her administrative complaint to HHS, Plaintiff acknowledged that the physicians at Freeman Hospital West concluded that she was *not* having a medical emergency at that time, and that she was specifically found to be *medically stable* at the time of that encounter. (Exhibit 2, para. 19, 21.)

18. Contrary to the allegations made in the current Complaint, Plaintiff's administrative complaint to HHS alleged that Freeman gave her "two options: she could stay at the hospital *to receive IV antibiotics while waiting for her labor to begin on its own or until her condition worsened – her vital signs could become unstable…* or she could leave." (Id, para. 21, emphasis added; contrast S.O.F. No. 16, supra.)

19. According to the CMS "investigation" referred to in her current Complaint, Ms. Farmer elected to be admitted to Freeman Hospital West because she was "unable to afford to travel." (Exhibit 2, p. 8.)

20. At 4:49 p.m. the same day, Ms. Farmer reportedly changed her mind and asked to be discharged. (Id.)

21. Plaintiff alleges, "Given the substantial, immediate risks to her health and life, Ms. Farmer and her husband hurriedly sought care out of state." (Doc. 1, para. 23.)

22. In an administrative complaint to the Office of Civil Rights[4] claiming discrimination, Plaintiff stated that she "returned home to rest" before seeking care in another state, and

[4] This complaint and/or its allegations appear to have been made to the State of Kansas as well in furtherance of a claim of discrimination as referenced in the statement of prior administrative remedies outlined in the Complaint. (Doc. 1, p. 5-6.)

that she slept for some period of time before deciding how to proceed. (Exhibit 3, para. 17.)

23. In her administrative complaint to the Office of Civil Rights, Plaintiff stated that "before leaving their house on the evening of August 2, 2022, Ms. Farmer and her boyfriend attempted to contact multiple hospitals in southern Illinois." (Id, para. 18.)

24. Plaintiff submitted administrative complaints against those hospitals for different reasons, but did not present to those locations for treatment. (Id, para. 10.)

25. In her administrative complaint to HHS, Plaintiff alleged that she "began calling hospitals in Kansas" after discussions with the Illinois hospitals noted above. (Exhibit 2, para. 20.)

26. In her administrative complaint to HHS, Plaintiff claimed that she was "nervous to travel [to Kansas] because she knew that there was an election occurring at the time that would decide whether the state's constitution should continue to protect abortion rights." (Exhibit 2, para. 24.)

27. In her administrative complaint to HHS, Plaintiff claimed that an employee of Labette Health in Parsons, Kansas, discouraged Ms. Farmer from presenting to the emergency department at that hospital because it is "small." (Exhibit 2, para. 11.) Plaintiff lodged an administrative complaint against Labette Health as well.

28. Ms. Farmer reportedly contacted at least one hospital in Wichita, and she alleges that this hospital also dissuaded her from presenting for care. (Id, n. 21.)

29. Plaintiff stated that she elected not to lodge an administrative complaint against that hospital, because it advised her to "go to the University of Kansas Health System in Kansas City, which is approximately 30 minutes closer to her home" than Wichita. (Id.)

30. There is no allegation suggesting that Ms. Farmer attempted to contact any of the level one trauma centers in Wichita regarding whether she could present for emergency care.

31. Plaintiff implies that the one hospital Ms. Farmer *did not* contact in advance of presentation was the one she ultimately traveled to, a hospital that is three hours away from her home. Plaintiff arrived just before 11:30 p.m. on August 2, 2022.[5] (Doc. 1, para. 24.)

32. In the current Complaint, Plaintiff alleges that she was evaluated in the labor and delivery unit at University of Kansas Hospital. (Doc. 1, para. 26-28.)

33. Plaintiff also alleges that a physician conducted a physical examination and completed an ultrasound in the process of evaluating Ms. Farmer after she presented to the emergency department. (Id, para. 28.)

34. Plaintiff alleges that a medical diagnosis was made as a result of that evaluation, including an assessment of whether she was experiencing a "medical emergency" at that time. (Doc. 1, 28.)

35. Plaintiff also alleges that the physician made specific decisions and determined what examinations and tests should be run based on a medical risk-benefit analysis applicable to her specific situation. (Id.)

36. In the current Complaint, Plaintiff claims that the assessing physician explained two different procedures that could be undertaken if they became medically necessary: induced labor, or surgical dilation and curettage ("D&C.") (Doc. 1, para. 35.)

37. When involving a live fetus, the latter is occasionally referred to as a surgical abortion. (See Doc. 1, para. 35.)

---

[5] While not necessary to resolution of the motion, Defendant suspects that Plaintiff would acknowledge two facts that are subject to judicial notice: 1) That the constitutional amendment referenced in her complaint failed by a margin of 59.16% to 40.84%, and 2) It was clear by 11:30 p.m. on August 2, 2022, that the amendment did not pass, if not long before that.

38. In her administrative complaint, Plaintiff claimed that there is only one potential "stabilizing treatment" for Ms. Farmer's condition: surgical abortion. (Exhibit 2, p. 24.)

39. In the current Complaint, Plaintiff now claims – intermittently - that stabilizing treatment should be "induction of labor." (Doc. 1, para. 39.)

40. She also claims for the first time that the treating physician "refused to provide [Ms. Farmer] with *any* treatment whatsoever." (*Id.,* emphasis in the original.)

41. Plaintiff alleges that "according to [her] medical records," her treating physician counseled her "about how quickly she could become ill from chorioamnionitis…but that she could not provide Ms. Farmer with the treatment necessary to prevent such illness due to detectable fetal cardiac activity." (Doc. 1, para. 10.)

42. The allegations made in paragraph 10 of the Complaint appear to selectively omit information from the cited medical record to create a misleading impression of its contents. The referenced record actually states:

**PLAN**
**PPROM**

- +pooling, +nitrzaine (blood in vault), +ferning, BSUS with anhydramnios
- +FHT on sono
- Patient and partner counseled on outcomes in cases with PPROM at 17wga, they do not desire to continue this pregnancy in light of those outcomes
- CBC with normal WBC
- Due to +FHT, cannot offer IOL or D&E, will refer to local abortion clinics.
  - Patient and partner state D&E at an abortion clinic is cost prohibitive for them and will likely need to "wait it out"
  - Patient counseled on chorioamnionitis signs/symptoms and how quickly she could become ill from chorioamnionitis. Counseled that if she experienced symptoms she should report to her local hospital and if they needed to transfer her to another facility, they would.
  - Counseled that if at any point there is no FHT and they desire IOL or D&E, we could perform at KU

(Exhibit 4.)

43. The Complaint contains no allegations suggesting that Ms. Farmer had signs of infection at the time of this encounter. (See Doc. 1, p. 10, alleging that a specific "stabilizing" treatment was required to reduce the risk of *potential* infection.)

44. Plaintiff alleges that she was discharged at 1:29 a.m. and that Ms. Farmer was in "terror and disbelief that her medical team had sent her home…" (Doc. 1, p. 11.)

45. Plaintiff further alleges that UKHA "never even offered to transfer" Plaintiff to a different hospital, but simultaneously alleges that transfer would have itself been an EMTALA violation. (Doc. 1, para. 78.) Instead, Plaintiff alleges that Ms. Farmer was known to have an emergency medical condition, but she was discharged without receiving "any treatment" at all, whether considered "stabilizing" or not. (*Id.*)

46. Without attaching the document itself, Plaintiff selectively quotes from the medical record as though to suggest Ms. Farmer was discharged in the face of a known emergency medical condition. (Doc. 1, para. 78.) In doing so, Plaintiff appears to specifically omit the information that contradicts that allegation. For example, the same record states that Ms. Farmer was specifically counseled on what signs or symptoms could change the medical analysis *as to whether she was having a medical emergency*, and she was instructed to return if any of those signs or symptoms developed. (Exhibit 4.)

47. Plaintiff alleges that she left UKHA and presented back to Freeman Hospital West in Joplin, Missouri, "where she was admitted for observation as her health continued to deteriorate." (Doc. 1, para. 45.)

48. In her administrative complaint to HHS, Plaintiff also accused the staff at Freeman Hospital West of initially refusing to admit her even upon her return on August 3, 2022. (Exhibit 2, para. 31.)

49. In claiming that Freeman Hospital West also violated EMTALA, Plaintiff's administrative complaint stated:

> "Other doctors [at Freeman Hospital West] who visited Ms. Farmer on the night of August 3[rd] expressed frustration to her about their inability to help her or other women like her. They explained to Ms. Farmer that she was not the first woman who had been denied care since Missouri's abortion ban had gone into effect. They told Ms. Farmer that they feared women like her 'would die' because Missouri's abortion laws prevented them from providing the best care possible." (Exhibit 1, para. 33.)

50. In her administrative complaint to HHS, Plaintiff stated that she "consistently told the medical providers at Freeman Hospital West that she desperately wanted to keep her daughter if she could, but she did not want to continue with a nonviable pregnancy that was putting her health and life at risk." (Exhibit 2, para. 34.)

51. In her administrative complaint to HHS, Plaintiff stated that while she was at Freeman Hospital West, her "pain increased severely," but she allegedly did not request medication for pain "because she did not want to be labeled a drug seeker." (Exhibit 2, para. 35.)

52. In the Complaint filed in this case, Plaintiff alleges that UKHA did not administer pain medication and implies that UKHA refused to treat pain that was reported. (Doc. 1, para. 10.)

53. Plaintiff alleges that she left Freeman Hospital West on August 4, 2022, "[k]nowing that she needed to travel elsewhere to obtain the life-saving care she needed…" (Doc. 1, para. 45.)

54. In her administrative complaint to HHS, Plaintiff alleged that she "felt pressured by [Freeman] staff to leave because they were not able to provide her with the [medical] care they knew she needed," and she left the hospital voluntarily "mid-morning on August 4, 2022." (Exhibit 2, para. 36.)

55. Plaintiff alleges that she sought care from an outpatient clinic in Illinois, and she was told to present to the clinic the *following day*. (Doc. 1, p. 46, emphasis added.)

56. She alleges that physicians in Illinois performed a surgical abortion on August 5, 2022, "to terminate Ms. Farmer's pregnancy." (Id.)

57. Without specificity as to time, Plaintiff alleges that at some point after the clinic visit in Illinois, Ms. Farmer "contacted her local obstetrician, who said that Ms. Farmer had likely developed an infection by the time she reached the clinic in Illinois…" (Doc. 1, para. 47.) No further specifics are provided and there is no allegation that Ms. Farmer was diagnosed with chorioamnionitis.

58. In her Complaint filed in this lawsuit, Plaintiff claims for the first time that UKHA failed to provide an "adequate medical screening examination," as that phrase is defined in EMTALA. (Doc. 1, p. 14-16.)

59. Plaintiff alleges that this "violation" of the "screening requirement" occurred through UKHA "failing to follow its own standard procedures for assessing individuals experiencing *obstetric emergencies*." (Doc. 1, para. 61, para. 65, emphasis added.)

60. Despite making a "failure to screen" claim, Plaintiff simultaneously alleges that UKHA specifically *diagnosed* an emergency medical condition and failed to stabilize it. (Doc. 1, para. 79.) The overarching claim is that "Ms. Farmer was entitled to emergency abortion care under state and federal law," and she claims that abortion was the only "stabilizing" treatment available. (Doc. 1, para. 5.)

61. Plaintiff also asserts a discrimination claim under Kansas law based on the same allegations underlying her EMTALA claim. In furtherance of that claim, Plaintiff alleges that a specific decision was made to "single out one group of people for substandard treatment – those who were pregnant." (Doc. 1, para. 88.)

## ARGUMENT AND AUTHORITY

### I. Plaintiff fails to state a valid claim that UKHA violated EMTALA.

Plaintiff alleges the following EMTALA violations: (1) UKHA failed to provide an appropriate medical screening examination" *and* that it somehow failed to stabilize a known emergency medical condition at the same time. (Doc. 1, Counts I & II.) The facts relief on for both claims are internally inconsistent and fail to state a claim for relief that is plausible on its face.

#### A. Plaintiff's Complaint concedes that UKHA provided an appropriate medical screening.

Plaintiff alleges that UKHA violated EMTALA when it purportedly failed to "follow its own standard procedures" for emergency department patients. (Doc. 1, para. 62.) However, what follows is a series of contradictory allegations and an inescapable conclusion that a "failure to screen" claim could never be sustained. Plaintiff's own allegations

In the current attempt to conjure an alternative "failure to screen" basis for a claim under EMTALA, Plaintiff claims a "failure to follow" procedures, specifically referring for the first time to a triage procedure and "[pre-term pre-labor rupture of membranes] guidelines." (Doc. 1, para. 63-64.) In other words, Plaintiff alleges that UKHA failed to follow a pre-medical screening procedure for triage, and a post-medical screening procedure purportedly applicable to dealing with the diagnosis that the screening produced. In fact, Plaintiff expressly acknowledges that she was taken to the labor and delivery unit and placed in a patient room, where: (1) a physician took a history, (2) a physical examination was conducted, (3) radiology tests were performed, and (4) medical judgment was used to reach a diagnostic conclusion that Plaintiff specifically alleges was *correct*. If that alone did not demonstrate the lack of merit in the "screening claim," Count II makes it abundantly clear when Plaintiff ties the alleged "failure to stabilize" to that same diagnosis. (Doc. 1, para. 76.)

In addition, the Tenth Circuit has also repeatedly held that "Mere de minimus (sic) variations from the hospital's standard procedures do not amount to a violation of hospital policy. To hold otherwise would impose [EMTALA] liabilities on hospitals for purely formalistic deviations when the policy had been effectively followed." *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 523 (10th Cir. 1994). In *Repp*, the plaintiff alleged that the hospital's screening policy required each assessment to include a "history of present illness," including a list of "pre-existing conditions, medications, and allergies." *Id* at 523. *Repp* held that while EMTALA bound a hospital to follow its own screening procedures, a violation of the EMTALA screening requirement would not be made by simply pointing out technical non-compliance with procedure. *Id* at 523.

Notwithstanding that the claimed "violations" in Plaintiff's Complaint are even better examples of the kind of *de minimis* departures that *Repp* rejected, the entire subject is irrelevant. Whatever process that included resulted in a diagnosis that Plaintiff does not even dispute. For that reason, any debate about what should or should not have been concluded in the screening process would be academic at best.

### B. Count II of Plaintiff's Complaint fails to state a claim for failing to provide "stabilizing treatment," because the facts and sources she references demonstrate that her condition was considered non-emergent.

As alluded to above, it is difficult to envision a scenario where a "failure to screen" claim could truly co-exist with a "failure to stabilize" claim in an EMTALA context, because the claims are implicitly contradictory. The "screening requirement" under 42 U.S.C. § 1395dd is for the stated purpose of attempting to determine whether an "emergency medical condition…exists." The "stabilizing treatment or transfer" requirement is then invoked if the "hospital determines that the individual **has** an emergency medical condition." 42 U.S.C. § 1395dd(b)(1), emphasis added. This means that the stabilization requirement is triggered only if the hospital has "*actual*

knowledge of the emergency medical condition." *Urban by and Through Urban v. King*, 43 F.3d 523, 525 (10th Cir. 1994). It is for that reason that a "failure to stabilize" claim would seemingly defeat any "failure to screen" claim on its own. For a hospital to have adequate knowledge that an emergency medical condition exists, it necessarily means that the objective of the "screening requirement" was apparently met.

This contradiction notwithstanding, Plaintiff's Complaint fails to state a claim for violating the "stabilizing treatment" requirement of EMTALA for other reasons. First, Plaintiff claims that the "emergency medical condition" at issue is the pre-term and pre-labor rupture of membranes, and she expressly claims that her UKHA physicians diagnosed that specific condition. Since transfer did not occur, this would mean that Plaintiff must make a facial showing: 1) that PPROM is itself an "emergency medical condition," as EMTALA defines the phrase, 2) that the "hospital" knew of the condition and the fact that it was emergent in nature,[6] and 3) that the hospital failed to make available "further medical examination and such treatment as may be required to stabilize the medical condition." In her complaint, Plaintiff does not even allege that Ms. Farmer was "unstable" at *any time*, much less while in the emergency department at UKH. Instead, Plaintiff makes generic allegations that "the risk of complications generally increases the earlier and longer the membranes are ruptured," and lists a series of conditions that she alleges *could* occur as a secondary complication to PPROM. (Doc. 1, para. 32-33.) Considering the rest of the Complaint, it seems safe to infer that if Plaintiff actually *had* any of the complications described, she certainly would have alleged as much here, irrespective of any debate over which of those conditions are

---

[6] See *Cleland v. Bronson Health Care Group*, 917 F.2d 266, 271 (6th Cir. 1990), upholding a Rule 12(b)(6) dismissal, in part, on the basis that "[i]f the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition." See also *Tank v. Chronister*, 941 F. Supp. 969, 972 (10th Cir. 1996); *Baber v. Hosp. Corp. of America*, 977 F.2d 872, 883 (4th Cir. 1992), applying the same analysis in claims of "unstable transfer."

actually considered "emergent" in a medical context. If the allegations in the Complaint fail to establish the existence of an unstable emergency medical condition, any claim alleging a failure to stabilize that condition necessarily fails as a matter of law.

Second, if the materials adopted by Plaintiff's Complaint are considered, the lack of merit in the Plaintiff's "failure to stabilize" claim becomes even more apparent. In a misguided attempt to bolster her claim, Plaintiff cites to what she says is an "HHS finding" that UKHA's "response" to her medical condition was "deficient" under EMTALA, going so far as to reference interviews with physicians as reported by "HHS." This includes submitting direct quotes that are seemingly truncated and mismatched to suggest that the physicians did, in fact, believe that Ms. Farmer had an "emergency medical condition" at the time of their assessment. As can be seen from reviewing the entirety of what Plaintiff purports to be quoting from, her characterization is simply inaccurate.

Irrespective of any disputes about accuracy, considering the report that Plaintiff cites to would defeat her claim. The labor and delivery nurse said that Ms. Farmer's nursing assessment was "normal," and there were no signs of instability in what she observed. (Exhibit 5, p. 26.)[7] The resident physician stated that induction of labor or surgical abortion could not be offered because the fetus had cardiac activity and there was no danger to the life of Ms. Farmer at that point. (Id, p. 27.) That same physician counseled Ms. Farmer on alternative locations where elective abortion could be performed, and Ms. Farmer was counseled on what symptoms would suggest potential secondary complications that could change the analysis as to whether an emergency medical condition existed. (Id.) The maternal-fetal medicine specialist is said to have succinctly reported the precise clinical distinction that is at issue here: If the condition is non-emergent, patients are

[7] The report drafter stated that no specific recorded temperature could be located in the record thereafter, but that the nurse reported "no fever" or signs of infection. Notably, Plaintiff does not allege that Ms. Farmer actually had a fever or infection at that point, nor could she consider the other objective data in the record.

managed on an outpatient basis. If the patient has complications and delivery is indicated, abortion or labor induction are options because that *is* considered an unstable emergency medical condition. (Id, p. 28-29.)

In other words, even though the report *conclusions* are demonstrably incorrect as to what EMTALA requires, the factual aspects of the report that she attempts to incorporate as a backdoor suggestion of merit instead have the opposite effect. The judgment of the medical professionals was that Ms. Farmer did not have an unstable emergency medical condition. If they believed she did have such a condition, or if such a condition subsequently developed as demonstrated by signs and symptoms that Ms. Farmer was specifically told to watch for, they said the plan would necessarily change. Accordingly, there could be no finding that Ms. Farmer was suffering from a known emergency medical condition at the time of the events at issue, which is a finding essential to a "failure to stabilize" claim.

**II. Plaintiff's claims do not fall within the class of claims EMTALA was intended to redress, and EMTALA was never intended to require the provision of specific medical treatment to individual patients.**

If this case is the subject of a future appeal, Defendant reserves the right to challenge Plaintiff's ability to bring an EMTALA case altogether. In reserving this challenge Defendant acknowledges the current existence of controlling Tenth Circuit authority that this Court will be bound to follow at this stage of the proceedings. In prior cases, the Tenth Circuit held that a plaintiff need not establish that he/she was uninsured to maintain an EMTALA action. *Collins v. DePaul Hospital,* 963 F.2d 303, 308 (10th Cir. 1992). In separate cases, the Tenth Circuit has held that a plaintiff need not prove that the motivating factor behind an EMTALA violation was a patient's "perceived inability to pay." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 797 (10th Cir.

2001). Defendant respectfully suggests that these holdings should be revisited. Having recognized that EMTALA was enacted to address a "distinct and rather narrow problem - the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them," *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir. 1996), federal courts gradually relieved civil litigants from establishing that their claims had anything to do with EMTALA's purpose at all. Illustrating the law of unintended consequences and the potential for absurd results does not even require a hypothetical, because it is precisely the case presented here: A patient who does not even allege that she was uninsured, who simultaneously alleges that she was deprived of medical care due to motives that were specifically *not* related to any perceived inability to pay.

Federal courts have repeatedly held that EMTALA is not a vehicle for pursuing federal redress of medical malpractice claims. *Urban*, 43 F.3d 523 (10th Cir. 1994); *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994); *Baber v. Hospital Corp. of America*, 977 F.2d 872, 879 (4th Cir. 1992). Here, Plaintiff seeks to use EMTALA for a purpose that is orders of magnitude beyond that, contending that the courts, not physicians, should declare what is and is not "emergency medical conditions" and dictate what treatments must be given in response to those conditions. (See Doc. 1, seeking declaratory judgment on the same.) If these declarations were made, presumably a judicial declaration of what constitutes clinical stability would need to follow, and eventually the medical judgment of physicians might be written out of the process altogether. EMTALA was never intended to be used for this purpose, and this case represents exactly the kind of abuse that failing to confine actions to EMTALA's purpose can lead to.

It is uncontested that EMTALA contains two primary requirements: screening and stabilization, and those points are not challenged here. The legislative intent behind the enactment

should also be undisputable. EMTALA was enacted to "respond to the specific problem of hospital emergency rooms refusing to treat patients who were uninsured or who could otherwise not pay for treatment." *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001). "In such situations, emergency rooms would either decline to provide treatment or transfer patients in an unstable condition to other hospitals, thereby jeopardizing patients' health." *Id.* Recognizing the problem and Congress's intent in enacting what it saw as a solution, federal courts generally held that a lack of "uniform treatment for all patients, *regardless of ability to pay*, is considered the linchpin of an EMTALA claim." *Vickers v. Nash Gen. Hosp. Inc*., 78 F.3d 139, 143 (4th Cir. 1996), (internal quotations omitted.) See also *Marshall v. East Carroll Parish Hosp. Serv. Dist*., 134 F.3d 319, 323 (5th Cir. 1998). The statute's intended purpose was recognized even in circuits that rejected any requirement to prove specific intent or motive on the part of the hospital in denying care, with those courts continuing to acknowledge that EMTALA's primary obligations were designed by Congress to ensure that patients did not receive disparate treatment based on a "perceived ability or inability to pay." *Phillips*, 244 F.3d at 797.

The United States Supreme Court ultimately resolved the question of whether the party claiming a violation of the "stabilizing treatment" section of EMTALA carried a burden to establish motive when it held that the statutory text itself stated no such requirement. *Roberts v. Galen of Va.* 525 U.S. 249, 252,119 S. Ct. 685, 142 L. Ed. 2d 648 (1999). In that opinion, the Court noted the conflict in the circuits regarding whether proof of motive is required to establish a violation of the "appropriate medical screening" requirement, but it declined to address the issue. *Id*, n. 1.

The circuits rejecting any need to prove "state of mind" in a claim of inappropriate screening may have been motivated themselves, at least in part, by a desire to avoid having EMTALA used as an alternative theory to create federal jurisdiction in what would otherwise be

state court malpractice claims. In *Phillips*, the Tenth Circuit rejected that exact argument made by a litigation *plaintiff*, which argued that a misdiagnosis combined with knowledge of a lack of insurance would transform a malpractice claim into an EMTALA claim. *Id*. In that context, the Tenth Circuit re-affirmed its holding that evidence of specific intent or motivation was unnecessary to prove an EMTALA claim, i.e., proof that the hospital knew the patient was uninsured and provided substandard care *because of* that knowledge. *Id* at 797-98. Instead, the Court again held that no "particular motive" was required for EMTALA liability to attach in the screening process, and that "[w]hile knowledge of a patient's lack of insurance coverage may be relevant to explain a failure to abide by established procedures, it alone does not establish a violation..." *Id* at 798. Other circuits took the same approach and held that no "evil motive" was required to establish a violation. *Summers,* 91 F.3d 1136. Even now, however, it appears that the Sixth Circuit remains the exception, and it continues to require proof of improper motive as an essential element of an EMTALA screening claim. See *Galuten v. Williamson Cty. Hosp. Dist.*, 2021 U.S. App. LEXIS 21536, *14 (6th Cir. Unpub. July 20, 2021).

Notwithstanding any question of whether specific motive on the part of a hospital should be required in the context of an "appropriate screening" claim, it would seemingly defy the purpose of the legislation to simultaneously hold that the plaintiff does not even need to be within the class of persons the statute was designed to protect in the first place. It is well-established both in regulations and in case law that hospitals can complete the usual registration processes so long as emergency care is not delayed solely for that purpose.[8] If a patient produced evidence of insurance during that process, how could that situation ever connect with the "distinct and rather narrow problem" that EMTALA sought to address – "the 'dumping' of uninsured, underinsured, or

[8] See 42 C.F.R. § 489.24(d)(4); *Kizzire v. Baptist Health Sys.*, 441 F.3d 1306, 1310 (11th Cir. 2006).

indigent patients by hospitals who did not want to treat them"? *Summers*, 91 F.3d at 1136. Moreover, if the plaintiff specifically *chooses* to plead motive and selects a motive having *nothing to do with ability to pay*, how could that claim ever be construed as falling within the class of claims EMTALA intended to redress?

Ironically, when determining it would not establish a motive element in proving an EMTALA claim and would instead adopt the "uniform treatment" standard, the Eighth Circuit foreshadowed the absurd result that it sought to avoid:

> "Plaintiff, for example, concedes that he has to show non-uniform or disparate treatment in order to succeed. He takes the position, however, that he has met this requirement. According to the hospital's own admission, a patient complaining of snapping and popping noises in his chest would have been given a chest x-ray. **Plaintiff, as we must assume for purposes of this motion for summary judgment, did make just such a complaint, but was not given the chest x-ray. He was therefore treated differently from other patients, and differently from the treatment prescribed by the hospital's normal screening process. Therefore he is entitled to recover under EMTALA.**
>
> The argument has a surface appeal, and, indeed, the panel that initially heard this case adopted this very approach.
>
> On reflection, we are not convinced.
>
> The important point for us is that the very respect in which the plaintiff's screening is said to be non-uniform -- **failure to order a chest x-ray for a patient complaining of popping noises in his chest -- is nothing more than an accusation of negligence**. We accept for purposes of this appeal from a summary judgment the proposition that Summers in fact made this complaint, and that the doctor did not hear him, or forgot what had been said. (There is no contention that the doctor deliberately failed to order a chest x-ray.) **This may have been medical malpractice, but if it is also an EMTALA violation, that statute has been converted into a federal cause of action for a vast range of claims of medical negligence. It would almost always be possible to characterize negligence in the screening process as non-uniform treatment, because any hospital's screening process will presumably include a non-negligent response to symptoms or complaints presented by a patient. To construe EMTALA this expansively would be inconsistent with the principles and cases set out earlier in this opinion**." *Summers*, 91 F.3d at 1138-39, emphasis added.

In so holding, the Eighth Circuit appears to have seen what was coming if any two mismatched workups were "disparate treatment" that created an EMTALA cause of action. If an uninsured patient could validly claim a violation based on a contention as to what an "appropriate medical screening" *should* include, as opposed to what it typically *does* include, it would constructively make EMTALA the federal medical malpractice statute it was never intended to be. Recognizing that, the Eighth Circuit stated that an EMTALA claim cannot be established simply alleging that the examination and treatment of an indigent patient should have included something more. *Id*.

Presumably, even the Eighth Circuit did not see coming what Plaintiff attempts here, which goes several steps beyond the claim rejected in *Summers*. Here, Plaintiff claims an EMTALA violation while not even alleging that she was uninsured or indigent, and she mixes her concepts to claim that a violation occurs if she does not get the exact same *treatment* that some other patient received in response to the same diagnosis. Apparently, under Plaintiff's theory, this "violation" could occur even when there is no difference between those patients as to the ability to pay, or perhaps even when it is the other patient who is uninsured and held up as the point of comparison. At that point, EMTALA is not even a medical negligence statute, it is an edict that patients must be permitted to select their own treatments or have clinical treatments pre-determined by judicial fiat, and it detaches the statute completely from its original purpose of protecting indigent patients having medical emergencies from being dumped onto the sidewalk.

For the reasons stated above, Defendant preserves an appellate request for review of prior holdings finding that proof of an EMTALA violation requires neither proof of the patient's inability to pay nor any evidence of the hospital's "perception" of that issue.

### III. Plaintiff states no valid legal claim for relief under the Kansas Act Against Discrimination.

If the Court finds a failure to state a claim on the EMTALA claims, it could decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367. However, the Court should adjudicate those claims in the interests of efficiency and preserving the resources of the parties, since Plaintiff has invoked supplemental jurisdiction.

Plaintiff concisely states the issue herself: She claims that she is part of a group of people "single[d] out…for substandard treatment – those who [are] pregnant." (Doc. 1, p. 89.) That is not a protected class of persons within the statute.

In *Harder v. Kan. Commission on Civil Rights*, 225 Kan. 556, 592 P.2d 456 (1979), a unanimous Kansas Supreme Court held that "pregnancy discrimination" is not interchangeable with "sex discrimination," as the latter phrase is used in K.S.A. 44-1009. In *Harder,* the court adopted the logic of a United States Supreme Court holding that clearly differentiated the terms:

> "The [program at issue] does not exclude anyone from benefit eligibility because of gender, but merely removes one physical condition – pregnancy – from the list of compensable disabilities. **While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification**." *Harder*, 225 Kan. at 558, quoting *Geduldig v. Aiello*, 417 U.S. 484, 496, n. 20, 94 S.Ct. 2485, 41 L. Ed. 2d 256 (1974).

For purposes of determining "classification," the *Harder* court noted that the plaintiff in that case was "not placed into a group of women, but rather a group identified as pregnant women as opposed to non-pregnant persons," therefore different treatment of pregnancy did not constitute "discrimination" under § 44-1001, et seq., as a matter of law. The point of differentiation was in the condition itself. *Harder*, 225 Kan. at 558.

Plaintiff's Complaint reads as though she is trying to make the very point the Court made in *Harder*. In all but roughly 2-3 references in the Complaint, Plaintiff refers to "*pregnant*

*individuals*," or "pregnant people," and only refers to "pregnant *women*" in the context of making legal conclusions regarding K.S.A. 44-1009(c). (See Doc. 1, para. 2-3, compared to Doc. 1, para. 4.) Since there are also women who are not pregnant, if nothing else, it cannot be said that sex is the determinative factor in the claimed discrimination. Based on the Kansas Supreme Court holding above, this claim should also be dismissed.

## **CONCLUSION**

The court should dismiss the Complaint. Defendant requests a hearing on the motion.

Respectfully Submitted,

SIMPSON, LOGBACK, LYNCH, NORRIS, P.A.

By: */s/ Trevin E. Wray*
Trevin E. Wray, KS #21165
Jaime L. Whitt, KS #26986
10851 Mastin St., Suite 1000
Overland Park, KS 66210
(913) 342-2500
(913) 342-0603 (Facsimile)
ATTORNEYS FOR DEFENDANT
UNIVERSITY OF KANSAS HOSPITAL
AUTHORITY

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of August, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and a copy was sent via electronic mail to the following:

Heather J. Schlozman
Mark V. Dugan
Dugan Schlozman, LLC
8826 Santa Fe Drive, Suite 307
Overland Park, KS 66212
heather@duganschlozman.com
mark@duganschlozman.com
ATTORNEYS FOR PLAINTIFF

*/s/ Trevin E. Wray, KS #21165*
Attorney