**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**CENTERS FOR MEDICARE & MEDICAID SERVICES**
**HEADQUARTERS**
Chiquita Brooks-LaSure, Administrator
7500 Security Blvd.
Baltimore, MD 21244
Chiquita.Brooks-LaSure@cms.hhs.gov

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**OFFICE OF REGIONAL HEALTH OPERATIONS**
**REGION 7**
Catherine Lindsey Satterwhite, Regional Health Administrator
601 E. 12th Street, S-1801
Kansas City, MO 64106
ROKCMORA@cms.hhs.gov

# ADMINISTRATIVE COMPLAINT

## COMPLAINANT

Mylissa Farmer
c/o National Women's Law Center
11 Dupont Circle N.W., Suite 800
Washington, D.C. 20036

## COMPLAINANT'S COUNSEL

Alison Tanner
Michelle Banker
Sunu Chandy
Rachel Easter
Christen Hammock Jones
Veronica Faison
11 Dupont Circle N.W., Suite 800
Washington, D.C. 20036
202-588-7602
atanner@nwlc.org
mbanker@nwlc.org

## RECIPIENTS

**Freeman Health System**
1102 West 32nd Street
Joplin, MO 64804



EXHIBIT
2

**The University of Kansas Medical Center**
3901 Rainbow Boulevard
Kansas City, KS 66160

**RECIPIENTS' COUNSEL**

Dwight Douglas
General Counsel
Freeman Health System
1102 West 32nd Street
Joplin, MO 64804

Brian A. White
General Counsel and Vice Chancellor for Legal Affairs
The University of Kansas
245 Strong Hall
1450 Jayhawk Blvd.
Lawrence, KS 66045-7535

## PRELIMINARY STATEMENT

1. This Complaint is filed by the National Women's Law Center (NWLC) on behalf of Mylissa Farmer, pursuant to the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA").

2. EMTALA was enacted to ensure that everyone can access the emergency care they need. This includes women and other pregnant people experiencing emergency pregnancy complications.

3. An individual need not be on the brink of death for EMTALA's protections to apply. An "emergency medical condition" under EMTALA includes conditions that place the individual's health in serious jeopardy.

4. Under EMTALA, if a person with an "emergency medical condition" seeks treatment at an emergency department that accepts Medicare funds, the hospital must provide stabilizing medical treatment.

5. For people experiencing emergency pregnancy complications, abortion care is sometimes a necessary stabilizing medical treatment.

6. Without access to emergency abortion care, individuals experiencing pregnancy complications are put at risk of severe infections, hemorrhaging, and other serious medical conditions, which may result in the loss of their uterus or death.

7. These are the risks that Ms. Farmer faced when, after her water broke at approximately 18 weeks of pregnancy, she was denied the emergency abortion care needed to protect her health and life by hospitals operated by Recipients—

Freeman Hospital West in Joplin, Missouri and the University of Kansas Hospital in Kansas City, Kansas—in direct contravention of their federal EMTALA obligations.

8. Following the Supreme Court's decision in *Dobbs v. Jackson Women Health Organization*, EMTALA's protections are more important than ever before. States nationwide, including Missouri, have rushed to ban abortion with only vague or unduly narrow exceptions for medical emergencies. Federal law requires a range of emergency medical care that a state may characterize as an illegal "abortion." This is creating situations where individuals, like Ms. Farmer, are denied emergency abortion care required under federal law, with detriments to their health, lives, and futures. It is critical that the federal government take swift and decisive action to investigate whether entities are acting in compliance with EMTALA and enforce this law when there are violations.

9. NWLC requests that the U.S. Department of Health and Human Services Centers for Medicare & Medicaid Services (CMS) and Region 7 Office investigate Freeman Hospital West and the University of Kansas Medical Center's refusal to provide emergency medical treatment to Ms. Farmer on August 2–4, 2022. NWLC is aware that CMS has already initiated an investigation into Freeman Hospital West regarding its role in the events of this Complaint and that this investigation has been referred to the Missouri Department of Health and Senior Services (DHSS). For the reasons discussed herein, there are grave and legitimate reasons to be concerned about the appropriateness of referring EMTALA

investigations to state survey agencies under these circumstances. NWLC therefore requests that CMS initiate an independent investigation into this Complaint, without referral to or involvement of agencies in either state, and at a minimum conduct an independent assessment of the facts presented in this Complaint when making its final compliance determination.

**JURISDICTION**

10. CMS oversees compliance with EMTALA. CMS Regional Offices evaluate and authorize all complaints. Cases warranting review are generally referred to the relevant state survey agency—typically the state health department or hospital licensing agency—for investigation. *See* State Operations Manual, Appendix V—Interpretive Guidelines—Responsibilities of Medicare Participating Hospitals in Emergency Cases, at 2, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107ap_v_emerg.pdf [hereafter SOM Appx. V]; *id.*, ch. 5, § 5410 *et seq.*, https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/som107c05pdf.pdf [hereafter SOM ch. 5].

11. CMS' regional offices retain delegated enforcement authority and make final enforcement decisions. SOM Appx. V at 7; *id.* ch. 5 §§ 5440.5, 5460. CMS regional offices need not accept the factual findings of the state survey agency or defer to the agency's recommendations; rather, they may consider additional information in making compliance determinations. SOM ch. 5 § 5460. CMS Region 7 Office, based in Kansas City, Missouri, serves both Missouri and Kansas, where Recipients' hospital facilities are located.

12. CMS may refer certain high priority cases directly to the HHS Office of Inspector General (OIG) for investigation. SOM ch. 5 § 5480.2.

13. Ms. Farmer is aware that CMS referred a complaint about her treatment at Freeman Hospital West to DHSS on October 20, 2022.

a. Ms. Farmer did not file the complaint that initiated that investigation.

b. Ms. Farmer received a phone call from a DHSS employee on the morning of October 25, 2022. Initially, the employee did not identify herself, and at no point did the employee clarify the nature of the investigation. When Ms. Farmer asked whether she should consult with her legal counsel before answering questions, the DHSS employee urged Ms. Farmer to speak to her without counsel. Ms. Farmer then requested that DHSS send her a letter explaining the nature of the investigation and the questions they wished to ask her. DHSS did not send this letter or make any further attempts to interview Ms. Farmer about her experiences at Freeman Hospital West.

c. In addition to investigating EMTALA complaints initiated by CMS, DHSS is partly responsible for enforcing Missouri's abortion laws. *See* MO. STAT. §§ 188.017(2), 188.065. Missouri, and DHSS in particular, has a demonstrated record of hostility to abortion. *See, e.g.*, Caroline Kitchener, *Missouri Lawmaker Seeks to Stop Residents from Obtaining Abortions Out of State*, THE WASHINGTON POST (Mar. 8, 2022, 2:21 p.m. EST), https://www.washingtonpost.com/politics/2022/03/08/missouri-abortion-ban-texas-supreme-court/ (describing Missouri

lawmakers' attempts to further restrict access to abortion care); Safia Samee Ali, *Missouri Health Director Tracked Menstrual Periods of Planned Parenthood Patients*, NBC NEWS (Oct. 29, 2019, 7:14 p.m. EDT), https://www.nbcnews.com/news/us-news/missouri-health-director-tracked-menstrual-periods-planned-parenthood-patients-n1073701 (describing DHSS's attempts to shut down the last remaining abortion clinic in the state); Bobby Allyn, *Missouri governor Signs Ban on Abortion After 8 Weeks of Pregnancy*, NPR (May 24, 2019, 12:26 p.m. ET), https://www.npr.org/2019/05/24/724532856/missouri-governor-signs-ban-on-abortion-after-8-weeks-of-pregnancy (describing Missouri's attempts to ban abortion pre-*Dobbs*).

e. Beginning on October 28, 2022, media reports speculated that DHSS was investigating Ms. Farmer as well as Freeman Hospital West. From the reports, Ms. Farmer learned that a state legislator, Missouri House Rep. Crystal Quade, filed Sunshine Law requests regarding the DHSS investigation in which Rep. Quade expressed concern that DHSS was investigating Ms. Farmer herself. The reporting states that Rep. Quade learned of the DHSS investigation through an unknown whistleblower. *See, e.g.*, Suzan Szuch, *Rep. Crystal Quade Requests Records of MO Investigation into Joplin Woman, Hospital*, SPRINGFIELD NEWS-LEADER (Oct. 28, 2022 1:34 p.m., updated Oct. 31, 2022 3:22 p.m.), https://www.news-leader.com/story/news/local/ozarks/2022/10/28/alleged-investigation-into-joplin-woman-hospital/69600167007/; Kylie Cheung, *Missouri Is Investigating Story of Woman Who Says She Was Denied a Life-Saving Abortion*,

JEZEBEL (updated article published Oct. 31, 2022), https://jezebel.com/missouri-is-reportedly-investigating-a-woman-who-says-s-1849723896.

f. Ms. Farmer did not learn that DHSS was investigating Freeman Hospital West for an EMTALA violation on CMS's behalf until this was reported in the media on November 1, 2022. *See, e.g.*, Rudi Keller, *State Says Feds Initiated Investigation of Missouri Hospital that Denied Emergency Abortion*, THE PITCH (Nov. 1, 2022), https://www.thepitchkc.com/state-says-feds-initiated-investigation-of-missouri-hospital-that-denied-emergency-abortion/; Harris Meyer, *Hospital Investigated for Allegedly Denying an Emergency Abortion After Patient's Water Broke*, KAISER HEALTH NEWS (Nov. 1, 2022), https://khn.org/news/article/emtala-missouri-hospital-investigated-emergency-abortion/.

g. Although DHSS has since publicly disclaimed that they are investigating Ms. Farmer, the failure of DHSS to specify the nature or purpose of their investigation on October 25, 2022, and the subsequent public speculation surrounding the investigation has only compounded Ms. Farmer's trauma from the denial of emergency medical care. DHSS's call was particularly frightening given heightened awareness and concern around criminalization of abortion patients in the wake of the *Dobbs* decision.

h. Indeed, this case presents a prime example of why it is imperative for the federal government to not solely rely on state agencies to investigate cases of pregnancy-related emergencies, especially when the state agency is also responsible for enforcing a state abortion ban, otherwise has demonstrated hostility to abortion,

or there are signs of political interference in the agencies' work. Referring EMTALA investigations to the state agencies in these circumstances creates confusion and fear, as well as a potential conflict of interest. Entrusting state agencies charged with enforcing abortion bans that are in direct conflict with EMTALA to honor the supremacy of federal law could put pregnant patient's health and lives at risk.[1] Moreover, patients, providers, and those who support them will understandably be concerned about how the state agency will use information obtained during the EMTALA investigation; this will likely have a chilling effect that impedes the full and fair assessment of EMTALA claims.

i. In this environment, Ms. Farmer is concerned about the scope and impartiality of DHSS's investigation of Freeman Hospital West's EMTALA violation. DHSS has not followed up to interview her as she requested, even though it must submit its investigation paperwork to the CMS Region 7 Office today—November 8, 2022—ten business days following the completion of the October 25, 2022, onsite survey. *See* SOM Appx. V at 6; *id.* § 5450. And even if Ms. Farmer ultimately receives the opportunity to speak to DHSS before their investigation concludes, Ms. Farmer remains concerned about how that information may be used by DHSS given the agency's authority to enforce Missouri's abortion ban and demonstrated record of hostility to abortion.

---

[1] *See, e.g.*, *Texas v. Becerra*, NO. 5:22-CV-185-H, Am. Compl. Dkt. #18 (N.D. Tex. Jul. 28, 2022) (challenging HHS EMTALA guidance based on contention that EMTALA does not preempt contrary state law banning abortion).

14. Given the myriad complications with state enforcement of EMTALA in this case, Ms. Farmer requests that CMS and Region 7 Office conduct an independent investigation of this Complaint against both Recipients, whether by referring this matter to OIG if necessary or otherwise. At minimum, Ms. Farmer requests that CMS exercise its discretion to independently review and consider the facts contained in this Complaint before concluding its investigation and making any compliance determinations.

**FACTUAL ALLEGATIONS**

15. When Mylissa Farmer first learned that she was pregnant, she and her boyfriend were overjoyed. Because of her history of polycystic ovary syndrome and prior pregnancy loss, Ms. Farmer had believed that she would never have a baby. Ms. Farmer and her partner were excited to build a life and a future together for their daughter.

16. Approximately 18 weeks into her pregnancy, on August 1, 2022, Ms. Farmer had a regular maternity care appointment with her obstetrician-gynecologist, Dr. Jana Allison, at Freeman Women's Healthcare Associates in Joplin, Missouri. Although Ms. Farmer's pregnancy was complicated by her age (41) and her history of hypertension and deep vein thrombosis (DVT) during a COVID-19 infection in June 2021, everything appeared to be going well. Dr. Allison prescribed Lovenox and aspirin, prophylaxes for pregnant patients at risk for thromboembolic complications. Dr. Allison also noted that Ms. Farmer had been taking amoxicillin for a tooth infection for a few days.

17. At around 6:30 the next morning, on August 2, 2022, Ms. Farmer experienced a large gush of fluid from her vagina along with bleeding, abdominal pressure, pain, and cramping. Ms. Farmer called Dr. Allison's office and was advised to go immediately to the emergency department at Freeman Hospital West. When Ms. Farmer arrived at the emergency department, she was taken directly to the labor and delivery unit.

18. A PH strip test indicated that Ms. Farmer was leaking amniotic fluid. Bedside and transvaginal ultrasound testing confirmed that Ms. Farmer's amniotic fluid index was zero. Further examination confirmed that Ms. Farmer's cervix was dilated, and ferning—a sign of ruptured membranes—was evident.

19. Dr. Allison, who was on call at Freeman Hospital West that morning, and her colleague, Dr. Shayna Conner from the maternal and fetal medicine department, determined that Ms. Farmer had experienced previable preterm premature rupture of membranes (PPROM) and that her vaginal bleeding was consistent with "inevitable abortion." The doctors also determined that although Ms. Farmer's vital signs were currently stable, she was at "risk of maternal thrombosis given her history of DVT, infection /sepsis, severe blood loss, hysterotomy, hysterectomy, and even mortality." Further, given Ms. Farmer's vaginal bleeding, cervical dilation, cramping, and ruptured membranes, the doctors concluded that the likelihood for the pregnancy to continue to a gestational age where the fetus could potentially survive was "extremely low." Instead, the doctors anticipated that pregnancy loss was imminent and that at this gestational age the

fetus would have "zero" chance of survival. The doctors concluded that the "fetus [wa]s not viable" and advised Ms. Farmer that she could either receive medical intervention to aid the process of her "inevitable" miscarriage, or wait and jeopardize her health or life.

20. Contrary to their medical judgment, however, Dr. Allison and Dr. Conner were unable to provide Ms. Farmer with the necessary medical intervention based on the Freeman Hospital West legal department's assessment of Missouri law. Just 39 days earlier, the Attorney General of Missouri had issued an opinion putting into effect Missouri Statute § 188.017, which makes it a Class B felony to perform abortion care when—as was still the case with Ms. Farmer's pregnancy—a positive fetal heart tone is detectable. *See* Opinion Letter No. 22-2022 Re: Immediate Efficacy of Section 188.017, RSMo. (June 24, 2022), https://ago.mo.gov/docs/default-source/press-releases/22-2022.pdf?sfvrsn=39ffd2d_2. The Missouri law provides for a narrow affirmative defense if a physician can convince a jury that the patient was experiencing a "medical emergency." MO. STAT. § 188.017(3); *see also* MO. STAT. § 188.075(2). "Medical emergency" is vaguely defined by Missouri law as:

> [A] condition which, based on reasonable medical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert the death of the pregnant woman or for which a delay will create a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman.

MO. STAT. § 188.015(7). The Freeman Hospital West legal department had determined that Ms. Farmer's condition did not clearly meet this definition.

"Missouri law supercedes [*sp*] our medical judgment," Dr. Conner wrote in Ms. Farmer's medical records, and so Ms. Farmer could not receive "the most appropriate management based on [Dr. Conner's] medical opinion."

21. Thus, Freeman Hospital West gave Ms. Farmer two options: she could stay at the hospital to receive IV antibiotics while waiting for her labor to begin on its own or until her condition worsened—her vital signs could become unstable; she could develop a severe infection such as sepsis or chorioamnionitis; she could develop blood clotting including acute maternal thrombosis or disseminated intravascular coagulation; or she could hemorrhage—or she could leave. Dr. Conner made clear that "[a]waiting a medical emergency" as narrowly defined under Missouri law "may put [Ms. Farmer] at further risk for maternal mortality, hysterotomy, hysterectomy."

22. Dr. Allison orally instructed Ms. Farmer to go to an emergency department out of state because it was her understanding that any out of state hospital would be required by law to treat Ms. Farmer. Dr. Allison also warned Ms. Farmer about how quickly a grave infection could develop and explained that the amoxicillin Ms. Farmer was taking for her toothache could mask the symptoms of an infection. Dr. Allison urged that if Ms. Farmer was not able to travel immediately to an out of state hospital, she should stay at Freeman Hospital West because her life would be in jeopardy if she traveled more than 30 minutes away from an emergency department. But when Ms. Farmer asked whether Dr. Allison was sure that the doctors at Freeman Hospital West could save her life if she

developed the type of conditions that would make her situation a "medical emergency" under Missouri law, Ms. Farmer felt that Dr. Allison seemed "hesitant."

23. Given these substantial, immediate risks to her health and life, Ms. Farmer decided to travel to another state to obtain care. When Ms. Farmer left Freeman Hospital West, she was still bleeding and very fatigued. Before beginning the long drive out of state, Ms. Farmer and her boyfriend returned home to rest. As Ms. Farmer slept, her boyfriend stayed awake to watch over her.

24. Before leaving their house, Ms. Farmer and her boyfriend called multiple hospitals on the Illinois-side of St. Louis; they could not get through to one, another said it was not big enough to provide the care she needed, and the other said that they were only able to handle miscarriages later in pregnancy. She also tried calling two abortion clinics, but she could not get through to either.[2] She then began calling hospitals in Kansas, although she was nervous to travel there because she knew that there was an election occurring at the time that would decide whether the state's constitution should continue to protect abortion rights. Two Kansas hospitals informed Ms. Farmer that they were not equipped to provide her with the care she needed, and the last advised her to go to the University of Kansas Hospital because it was the nearest and largest emergency department in the state.

[2] Since the Supreme Court's decision in *Dobbs*, abortion clinics in Illinois, Kansas, and other abortion-protective states have been struggling to meet unprecedented patient demand. *See, e.g.*, Shefali Luthra, *'We Feel Kind of Powerless': The End of* Roe *Is Overwhelming Clinics in States that Protect Abortion*, The 19th (July 15, 2022, 2:20 p.m. ET), https://19thnews.org/2022/07/end-of-roe-overwhelming-abortion-clinics/.

25. At 11:27 PM on August 2, 2022, Ms. Farmer arrived at the emergency department of the University of Kansas Hospital, a three-hour drive from her home. She was immediately taken by wheelchair to a bed in the labor and delivery department.

26. Dr. Leslie Dunmire performed Ms. Farmer's physical exam shortly after midnight on August 3, 2022. Dr. Dunmire independently determined that Ms. Farmer had experienced PPROM and that her pregnancy was no longer viable. Upon visual exam, Dr. Dunmire also determined that Ms. Farmer's cervix was dilated. Dr. Dunmire then performed a bedside ultrasound and determined that Ms. Farmer's pregnancy was anhydramnios—meaning there was no longer any amniotic fluid surrounding the fetus. Dr. Dunmire did not exam Ms. Farmer digitally or perform a transvaginal ultrasound for fear of further increasing her risk of infection.

27. While at the University of Kansas Hospital, Ms. Farmer felt her symptoms worsen. Her fatigue grew more intense, she experienced mental fog, and the dull ache of cramping turned into more serious pain.

28. Dr. Dunmire recommended medical intervention due to the risks to Ms. Farmer's health and the nonviability of her pregnancy. Dr. Dunmire told Ms. Farmer they could either induce labor or surgically end the pregnancy, although Dr. Dunmire recommended inducing labor due to concerns that the surgery would "resemble an abortion" and therefore might not be permitted by the hospital. Dr. Dunmire also advised that inducing labor would give Ms. Farmer the

opportunity to hold her daughter and say goodbye. Ms. Farmer and her boyfriend desperately wanted that opportunity.

29. Nearly twenty minutes later, however, Dr. Dunmire returned to Ms. Farmer's bedside with devastating news: despite Dr. Dunmire's medical opinion, legal counsel for the University of Kansas Hospital had determined that Dr. Dunmire could not provide *any* treatment, including inducing labor, because it would be "too risky in this heated political environment to intervene." Dr. Dunmire wrote in Ms. Farmer's medical records that she could not provide Ms. Farmer with care due to the positive fetal heart tone, and she urged Ms. Farmer to seek care elsewhere because of "how quickly she could become ill from chorioamnionitis."

30. Ms. Farmer was discharged from the University of Kansas Hospital at 1:29 AM on August 3, 2022. No medical provider at the University of Kansas Hospital administered medication to Ms. Farmer for her pain or otherwise provided her with medical treatment.

31. Ms. Farmer and her boyfriend returned home on August 3 in a state of disbelief and terror that no doctor was willing to take the steps necessary to save her life, as well as grief for the inevitable loss of their daughter. Without other apparent options, Ms. Farmer decided to follow Dr. Allison's advice from the day prior and return to Freeman Hospital West for monitoring overnight. Although Ms. Farmer conveyed these instructions to hospital staff, although the ER physician determined that the "pregnancy was not viable," and although Dr. Allison's earlier examination had revealed that Ms. Farmer's cervix was 4 cm dilated, the labor and

delivery department initially refused to admit her before ultimately acceding to Dr. Allison's instructions. Doctors continued to refuse to induce Ms. Farmer's labor, however, or otherwise medically intervene to resolve her pregnancy complications.

32. Overnight, Ms. Farmer was visited by a doctor from the NICU department who provided her with grim details about the fate of her pregnancy. Because her cervix was dilated and there was no amniotic fluid surrounding the fetus, the doctor affirmed that there was virtually no chance Ms. Farmer would be able to carry her pregnancy to a point when it would be viable. But as she continued to go without care, Ms. Farmer was told, her uterus was constricting around her daughter, crushing her tender bones. The NICU doctor expressed to Ms. Farmer that "there are some fates worse than death."

33. Other doctors who visited Ms. Farmer on the night of August 3 expressed frustration to her about their inability to help her or other women like her. They explained to Ms. Farmer that she was not the first woman who had been denied care since Missouri's abortion ban had gone into effect. They told Ms. Farmer that they feared women like her "would die" because Missouri's abortion laws prevented them from providing the best care possible.

34. Ms. Farmer consistently told the medical providers at Freeman Hospital West that she desperately wanted to keep her daughter if she could, but she did not want to continue with a nonviable pregnancy that was putting her health and life at risk.

35. During this visit to Freeman Hospital West, Ms. Farmer was "beyond scared." Her pain had increased severely, but she was afraid to ask for medication because she did not want to be labeled a drug seeker. She was ultimately provided with some Tylenol and medication for anxiety.

36. Ms. Farmer remained at Freeman Hospital West until mid-morning on August 4, 2022. Although she was given the option of staying at the hospital for observation, she felt pressured by staff to leave because they were not able to provide her with the care they knew she needed. Leaving the hospital, in addition to ongoing pain, fatigue, and mental fog, Ms. Farmer felt defeated and humiliated.

37. After returning home, Ms. Farmer learned that a clinic in Illinois would offer her urgent care if she could travel there by the next morning. Ms. Farmer and her boyfriend spent the evening figuring out how they could pay to travel so far and stay overnight, especially since they had only $45 available between them. During that time, Ms. Farmer felt fatigued and emotionally drained. Her bleeding began decreasing, but her pain and cramping were increasing. Ms. Farmer and her boyfriend tried to get a few hours sleep before leaving their house at 3:00 AM to begin the 4.5-hour journey north.

38. At around 4:00 AM on August 5, 2022, Ms. Farmer began to experience severe cramping, contractions, and back pain while in the car on the way to Illinois. Ms. Farmer decided to keep going—she did not want to go to any other emergency departments in Missouri because she did not trust that they would provide her with medically appropriate care.

39. By the time Ms. Farmer arrived at the clinic in Illinois at approximately 10:00 AM on August 5, 2022, she was in active labor and nearly fully dilated. The physician at the Illinois clinic was immediately able to perform a surgical procedure to end her pregnancy and eliminate the risk to her life and health.

40. Ms. Farmer was relieved and grateful that the Illinois clinic was able to provide her with the life-saving care she needed. At the same time, though, she was also distraught that Freeman Hospital West and University of Kansas Hospital denied her and her boyfriend the opportunity to induce delivery so that they could hold and say goodbye to their daughter.

41. Over the next few days, Ms. Farmer continued to experience pain and vaginal discharge. Ms. Farmer contacted Dr. Allison, who prescribed another round of antibiotics because she said that Ms. Farmer likely had developed an infection.

42. Over the days during which she was denied care by Freeman Hospital West and the University of Kansas Hospital, Ms. Farmer missed work and was docked pay amounting to the equivalent of one paycheck. Ms. Farmer's boyfriend lost his job because he was forced to miss work to help Ms. Farmer travel to and from Freeman Hospital West, the University of Kansas Hospital, and the clinic in Illinois. Although he has since obtained a new job, it pays significantly less.
Ms. Farmer is anxious that she soon will receive bills from Freeman Hospital West and the University of Kansas Hospital. Ms. Farmer's insurance company refused to cover the care that she ultimately received from the clinic in Illinois. With the

wages they lost and the out-of-pocket expenses they already incurred to get Ms. Farmer the care she needed, Ms. Farmer and her boyfriend are now behind on their bills and struggling to make ends meet. They have had to ask their family for financial support during this trying time.

43. Ms. Farmer continues to suffer harm including to her physical and mental health resulting from the mistreatment she experienced at Freeman Hospital West and the University of Kansas Hospital. Some days, she is unable to leave her bed, and she is worried that she will lose her job because she cannot sleep, cannot eat, and cannot focus. She cannot get her mind off the loss of her daughter or the fact that other women are being forced to go through what she went through. She has lost faith in the medical providers in her community, and so she has avoided seeking treatment for ongoing pain and urological issues. She has sought psychiatric care, however, and she was recently prescribed four medications to treat her severe emotional distress relating to these experiences.

44. Further, because of her mistreatment at Freeman Hospital West and the University of Kansas Hospital, Ms. Farmer made an emotionally difficult decision to obtain tubal ligation. She believes that if she were to become pregnant again in Missouri, she would likely die. She hopes to be able to move out of the state soon.

**LEGAL ALLEGATIONS**

45. EMTALA was enacted in 1986 with the overarching purpose of ensuring that all patients receive emergency medical care—regardless of the

patient's ability to pay. *See Birchansky v. Clabaugh*, 955 F.3d 751, 757 (8th Cir. 2020). Under the Act, when a patient arrives at or is transferred to an emergency department and requests treatment, the hospital must provide an appropriate screening examination "to determine whether or not an emergency condition" exists and, if so, to provide stabilizing medical treatment. 42 U.S.C. § 1395dd(a).

a. EMTALA preempts any state law with which it conflicts. *See* 42 U.S.C. § 1395dd(f) (stating that EMTALA preempts state law "to the extent that the [state law] requirement directly conflicts with a requirement of this section"); *Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068, 1070 (8th Cir. 2000) (holding that Missouri's sovereign immunity law directly conflicts with and is therefore preempted by EMTALA); *United States v. Idaho*, --- F. Supp. 3d ----, No. 1:22-cv-00329-BLW, 2022 WL 3692618, at *8–14 (D. Idaho Aug. 24, 2022) (holding that Idaho Code § 18-622—which, like Missouri Code § 188.017 criminalizes performing an abortion with a narrow affirmative defense for medical emergencies—would make it impossible for physicians to comply with EMTALA and frustrate EMTALA's purpose by deterring abortion care).

46. Freeman Hospital West and the University of Kansas Hospital are subject to EMTALA's requirements.

a. EMTALA applies to every hospital that has an emergency department and participates in Medicare. 42 U.S.C. § 1395cc(a)(1).

b. Freeman Hospital West in Joplin, Missouri, and the University of Kansas Hospital in Kansas City, Kansas, each operate an emergency department.

*See Emergency Medicine*, FREEMAN HEALTH, https://www.freemanhealth.com/specialty/emergency-services; *Emergency Department in Kansas City, KS*, THE UNIVERSITY OF KANSAS HEALTH SYSTEM, https://www.kansashealthsystem.com/locations/Emergency-Department-Kansas-City-KS.

c. Freeman Health System, the University of Kansas Medical Center, and their counterpart hospitals participate in Medicare. *See Billing and Insurance*, FREEMAN HEALTH SYSTEM, https://www.freemanhealth.com/billing-and-insurance#964037043-1186226676; *Insurance Coverage*, THE UNIVERSITY OF KANSAS HEALTH SYSTEM, https://www.kansashealthsystem.com/patient-visitor/financial/insurance/medicare-and-medicaid.

47. EMTALA defines an "emergency medical condition" to include:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy;
> (ii) serious impairment to bodily functions, or
> (iii) serious dysfunction of any bodily organ or part…

42 U.S.C. § 1395dd(e)(1).

a. CMS has made clear that "complications of pregnancy loss" are emergency medical conditions under EMTALA. *See Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (Sept. 17, 2022), at 4, https://www.cms.gov/files/document/qso-21-22-hospital-revised.pdf [hereinafter EMTALA Guidance].

48. If a patient has an emergency medical condition, a hospital must examine the patient and provide stabilizing treatment at the hospital, although transfer is permitted under certain circumstances. 42 U.S.C. § 1395dd(b)(1).

a. Under EMTALA, stabilizing an emergency medical condition generally means providing medical treatment "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during" a discharge or transfer to another facility. 42 U.S.C. § 1395dd(e).

b. CMS has made clear that "stabilizing treatment" for pregnant patients could include "dilation and curettage (D&C)" or otherwise medically or surgically intervening to end a pregnancy. EMTALA Guidance at 4.

49. Freeman Hospital West and the University of Kansas Hospital's treatment of Mylissa Farmer violated EMTALA.

a. During both visits to Freeman Hospital West (August 2 and August 3–4, 2022) and at the University of Kansas Hospital (August 2–3, 2022), Ms. Farmer was experiencing an emergency medical condition—complications of pregnancy loss.

b. Freeman Hospital West and the University of Kansas Hospital each had the capability and capacity to provide the necessary stabilizing treatment to Ms. Farmer—surgical intervention to end her pregnancy.

c. Freeman Hospital West and the University of Kansas Hospital also knew that failing to treat Ms. Farmer would lead to material deterioration of her condition. Indeed, the hospitals' actions were predicated on the understanding that her condition *would* deteriorate if she did not obtain surgical intervention to end

her pregnancy. Nonetheless, both hospitals determined that they would not provide that care to Ms. Farmer until she began suffering severe conditions that would place her at the brink of death, because at that point it would become politically palatable to provide her care.

d. EMTALA required Freeman Hospital West and the University of Kansas Hospital to provide stabilizing treatment to Ms. Farmer under these circumstances, irrespective of any state law or mandate. *See* EMTALA Guidance at 4.

**RELIEF REQUESTED**

50. NWLC, on behalf of Ms. Farmer, requests that CMS and/or HHS OIG:

a. Independently investigate Freeman Hospital West and the University of Kansas Hospital for EMTALA violations arising from their refusal to provide Ms. Farmer with the abortion care necessary to preserve her life and health on August 2–4, 2022.

b. Take all necessary steps to remedy all unlawful conduct identified in its investigation, including by imposing all appropriate penalties and by clarifying that EMTALA preempts Missouri Statute § 188.017.

c. Monitor any resulting agreements with Freeman Hospital West and the University of Kansas Hospital to ensure that compliance with EMTALA is achieved.

d. Provide Ms. Farmer with such equitable relief as is appropriate.

Respectfully submitted,

______________________________

Alison Tanner
Michelle Banker
Sunu Chandy
Rachel Easter
Christen Hammock Jones
Veronica Faison
11 Dupont Circle N.W., Suite 800
Washington, D.C. 20036
202-588-7602
atanner@nwlc.org
mbanker@nwlc.org

Date: November 8, 2022