**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**OFFICE FOR CIVIL RIGHTS**
**HEADQUARTERS**
Melanie Fontes Rainer, Director
200 Independence Avenue, S.W.
Room 509F HHH Bldg.
Washington, D.C. 20201
OCRComplaint@hhs.gov

# ADMINISTRATIVE COMPLAINT

## COMPLAINANT

Mylissa Farmer
c/o National Women's Law Center
11 Dupont Circle N.W., Suite 800
Washington, D.C. 20036

## COMPLAINANT'S COUNSEL

Michelle Banker
Alison Tanner
Sunu Chandy
Kelly Frye
Bridget Winkler
National Women's Law Center
11 Dupont Circle N.W., Suite 800
Washington, D.C. 20036
202-588-7602
mbanker@nwlc.org
atanner@nwlc.org

## RECIPIENTS

**Freeman Health System**
1102 West 32nd Street
Joplin, MO 64804

**Memorial Hospital**
4500 Memorial Drive
Belleville, IL 62226



EXHIBIT
3

**Labette Health**
1902 South U.S. Highway 59
Parsons, KS 67357

**The University of Kansas Hospital Authority**
**(d/b/a The University of Kansas Health System)**
4000 Cambridge St.
Kansas City, KS 66160-8501

**RECIPIENTS' COUNSEL**

Dwight Douglas
General Counsel
Freeman Health System
1102 West 32nd Street
Joplin, MO 64804

Sally Terrace
Senior Vice President and General Counsel
BJC Healthcare, Memorial Hospital
4901 Forest Park Avenue
St. Louis, MO 63108

Brian A. Williams
President and CEO
Labette Health
1902 South U.S. Highway 59
Parsons, KS 67357

Daniel Peters
Senior Vice President and General Counsel
The University of Kansas Health System
4000 Cambridge St.
Kansas City, KS 66160-8501

## PRELIMINARY STATEMENT

1. This Complaint of sex discrimination is filed by the National Women's Law Center (NWLC) on behalf of Mylissa Farmer, pursuant to Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557").

2. Section 1557 provides broad federal protections against discrimination based on race, sex, age, and disability in health care and health insurance. In enacting this provision, Congress sought to "remedy the shameful history of invidious discrimination and the stark disparities in outcomes in our health care system based on traditionally protected factors...."[1]

3. Section 1557 is the first federal law to broadly prohibit sex discrimination in health care programs that receive federal financial assistance.[2] As the Department has repeatedly acknowledged, discrimination on the basis of sex includes discrimination based on pregnancy or related care, including abortion care.[3] Section 1557 incorporates the "grounds prohibited" under Title IX, including its longstanding prohibition against discrimination on the basis of "termination of pregnancy or recovery therefrom."[4]

4. When a hospital otherwise offers comprehensive emergency care and has the competency to provide comparable gynecologic or obstetric care, refusing to provide emergency abortion care is sex discrimination. Abortion is a critical part of

---

[1] 156 Cong. Rec. S1842 (daily ed. Mar. 23, 2010) (Sen. Leahy).
[2] *See* 42 U.S.C. § 18116(a).
[3] *See, e.g.*, U.S. Dep't of Health & Human Servs., Off. for Civ. Rts., *Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Access to Comprehensive Reproductive Health Care Services*, at 3 (July 13, 2022), https://www.hhs.gov/sites/default/files/pharmacies-guidance.pdf [hereinafter *Guidance to Nation's Retail Pharmacies*].
[4] 34 C.F.R. § 106.40(b)(1).

the full spectrum of emergency and gynecologic and obstetric care.[5] Abortion is time sensitive and sometimes lifesaving health care, yet sex discrimination against people seeking to have abortions is commonplace, including in emergency situations.[6]

5. Discriminatory denials of emergency abortion care leave pregnant people without the medical treatment they need. This can lead to severe infections, hemorrhaging, and other serious medical conditions and may result in the loss of reproductive capacity or death.[7] Beyond these severe physical harms, pregnant people may be required to travel hundreds of miles and incur exorbitant costs to access the care they need. And experiencing discrimination in health care can also have other wide-ranging harms—including long term negative impacts on patients' wellbeing and economic security,[8] as well as long-lasting distrust of medical institutions and providers.[9]

6. This form of sex discrimination has only increased since the recent *Dobbs v. Jackson Women's Health Org.* decision, disproportionately impacting

---

[5] *See Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Sept. 17, 2022), at 4, https://www.cms.gov/files/document/qso-21-22-hospital-revised.pdf [hereinafter EMTALA Guidance]; AMERICAN COLLEGE OF OBSTETRICIANS & GYNECOLOGISTS, GUIDELINES FOR WOMEN'S HEALTH CARE: A RESOURCE MANUAL (4th ed.) (2014) [hereinafter ACOG Guidelines].

[6] *See, e.g.*, *Tamesha Means v. U.S. Conference of Catholic Bishops*, ACLU, https://www.aclu.org/cases/tamesha-means-v-united-states-conference-catholic-bishops; Brief of *Amici Curiae* Rachael Lorenzo, Mindy Swank, and Meghan Eagen in Support of Appellees and for Affirmance 7–20, *New York et al. v. Dept' Health & Human Servs.*, No. 19-4254, Doc. 323 (2d Cir. Aug. 3, 2020) (collecting stories of individuals denied lifesaving care to treat emergency pregnancy complications).

[7] *See generally* KARIMA R. SAJADI-ERNAZAROVA & CHRISTOPHER L. MARTINEZ, ABORTION COMPLICATIONS (2022).

[8] *See generally* DIANA GREENE FOSTER, THE TURNAWAY STUDY (2020).

[9] *Cf.* Mohsen Bazargan, Sharon Cobb & Shervin Assari, *Discrimination and Medical Mistrust in a Racially and Ethnically Diverse Sample of California Adults*, 19 ANNALS OF FAMILY MED. 4 (2021), https://www.annfammed.org/content/annalsfm/19/1/4.full.pdf.

people with limited resources, people of color, people in rural areas, young people, people with disabilities, and others who already face barriers to health care. These individuals experience intersecting and compounding discrimination when they are denied care, which Section 1557 was specifically designed to prohibit.[10]

7. Ms. Farmer's story is a prime example of the sex discrimination that Section 1557 forbids. When Ms. Farmer's water broke at approximately 18 weeks of pregnancy, she was refused the emergency abortion care needed to protect her health and life by four emergency departments in three different states—Freeman Hospital West in Joplin, Missouri; Memorial Hospital in Belleville, Illinois; Labette Health in Parsons, Kansas; and the main hospital campus of the University of Kansas Health System in Kansas City, Kansas. These hospitals' discriminatory actions directly contravened their obligations under Section 1557, which requires equal treatment on the basis of sex.

8. NWLC requests that the U.S. Department of Health and Human Services ("HHS") Office for Civil Rights ("OCR") investigate Ms. Farmer's claims of sex discrimination resulting from these Federal funding recipients' refusal to provide her emergency medical treatment on August 2–4, 2022, in violation of Section 1557.

---

[10] *See, e.g.*, 156 Cong. Rec. S1842 (daily ed. Mar. 23, 2010) (statement of Sen. Leahy); *Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *11–12. (D. Minn. Mar. 16, 2015) (holding that Section 1557 creates a "new, health-specific, anti-discrimination cause of action" that allows courts to address claims of intersectional discrimination).

## JURISDICTION

9. HHS is the agency with primary responsibility for implementing Section 1557, and OCR is responsible for ensuring compliance with Section 1557 and for receiving information about, investigating, and remedying violations of Section 1557.

10. On November 8, 2022, NWLC filed a complaint with the Centers for Medicare & Medicaid Services ("CMS") pursuant to the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), regarding the facts alleged in this complaint. CMS's investigation is ongoing. Section 1557 and EMTALA provide distinct and reinforcing protections to patients needing emergency abortion care and may be simultaneously enforced by the federal government.

## FACTUAL ALLEGATIONS

11. When Mylissa Farmer first learned that she was pregnant, she was overjoyed. Ms. Farmer had believed that she would never have a baby, and she and her boyfriend were excited to build a life and a future together for their daughter.

12. Approximately 18 weeks into her pregnancy, at around 6:30 a.m. on August 2, 2022, Ms. Farmer experienced a large gush of fluid from her vagina along with bleeding, abdominal pressure, pain, and cramping. Ms. Farmer called her obstetrician-gynecologist, Dr. Jana Allison, at Freeman Women's Healthcare Associates in Joplin, Missouri, and was advised to go immediately to the emergency

department at Freeman Hospital West. When Ms. Farmer arrived at the emergency department, she was taken directly to the labor and delivery unit.

13. Testing showed that Ms. Farmer had lost all amniotic fluid, that her cervix was dilated, and that there were signs her membranes had ruptured. Dr. Allison, who was on call at Freeman Hospital West that morning, and her colleague Dr. Shayna Conner determined that Ms. Farmer had experienced previable preterm premature rupture of membranes (PPROM) and that the likelihood for the pregnancy to continue to a gestational age where the fetus could potentially survive was "extremely low." Rather, the doctors concluded that pregnancy loss was imminent and that at this gestational age the fetus would have "zero" chance of survival. The doctors also determined Ms. Farmer was at "risk of maternal thrombosis given her history of DVT, infection /sepsis, severe blood loss, hysterotomy, hysterectomy, and even mortality." The doctors therefore advised Ms. Farmer that she could either receive medical intervention to aid the process of her "inevitable" miscarriage or wait and jeopardize her health or life.

14. Contrary to their medical judgment, however, Dr. Allison and Dr. Conner were denied the ability to provide Ms. Farmer with the necessary medical intervention based on the Freeman Hospital West legal department's assessment of Missouri law. Just 39 days earlier, the Attorney General and Governor of Missouri had issued statements putting into effect Missouri Statute § 188.017, which makes it a Class B felony to perform abortion care when—as was still the case with Ms. Farmer's pregnancy—a positive fetal heart tone is

detectable.[11] The Missouri law provides for a narrow affirmative defense if a physician can convince a jury that the patient was experiencing a "medical emergency."[12] "Medical emergency" is vaguely defined by Missouri law as:

> [A] condition which, based on reasonable medical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert the death of the pregnant woman or for which a delay will create a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman.[13]

The Freeman Hospital West legal department determined that it could not permit its doctors to provide care to Ms. Farmer under this law. "Missouri law supercedes [*sp*] our medical judgment," Dr. Conner wrote in Ms. Farmer's medical records, and so Ms. Farmer could not receive "the most appropriate management based on [Dr. Conner's] medical opinion."

15. Thus, Freeman Hospital West gave Ms. Farmer two options: she could stay at the hospital to receive IV antibiotics while waiting for her labor to begin on its own or until her condition worsened—her vital signs could become unstable; she could develop a severe infection such as sepsis or chorioamnionitis; she could develop blood clotting, including acute maternal thrombosis or disseminated intravascular coagulation; or she could hemorrhage—or she could leave. Dr. Conner made clear that "[a]waiting a medical emergency" as narrowly defined under

---

[11] *See* Opinion Letter No. 22-2022 Re: Immediate Efficacy of Section 188.017, RSMo. (June 24, 2022), https://ago.mo.gov/docs/default-source/press-releases/22-2022.pdf?sfvrsn=39ffd2d_2; Right to Life of the Unborn Child Act, Mo. Exec. Proclamation (June 24, 2022), https://governor.mo.gov/proclamations/governor-parson-signs-right-life-unborn-child-act-proclamation.

[12] MO. STAT. § 188.017(3); *see also* MO. STAT. § 188.075(2).

[13] MO. STAT. § 188.015(7).

Missouri law "may put [Ms. Farmer] at further risk for maternal mortality, hysterotomy, hysterectomy."

16. Dr. Allison orally instructed Ms. Farmer to go to an emergency department out of state because it was her understanding that any out of state hospital would be required by law to treat Ms. Farmer. Dr. Allison also warned Ms. Farmer about how quickly a grave infection could develop and urged that if Ms. Farmer was not able to travel immediately to an out of state hospital, she should stay at Freeman Hospital West because her life would be in jeopardy if she traveled more than 30 minutes away from an emergency department. But when Ms. Farmer asked whether Dr. Allison was sure that the doctors at Freeman Hospital West could save her life if she developed the type of conditions that would make her situation a "medical emergency" under Missouri law, Ms. Farmer felt that Dr. Allison seemed hesitant.

17. Given these substantial, immediate risks to her health and life, Ms. Farmer decided to travel to another state to obtain care. Ms. Farmer was distraught that she could not obtain lifesaving medical care in her immediate community. When Ms. Farmer left Freeman Hospital West, she was still bleeding and very fatigued. Before beginning the long drive out of state, Ms. Farmer and her boyfriend returned home to rest. As Ms. Farmer slept, her boyfriend stayed awake to watch over her.

18. Before leaving their house on the evening of August 2, 2022, Ms. Farmer and her boyfriend attempted to contact multiple hospitals in southern Illinois. One hospital instructed Ms. Farmer to contact "Memorial."[14]

19. When Ms. Farmer called Memorial Hospital in Belleville, Illinois, an employee informed her that the hospital would not treat patients experiencing pregnancy loss prior to 20 weeks of gestation. Although Memorial Hospital does not have a labor and delivery unit, the hospital provides "general OB/GYN services," including "care throughout pregnancy" and "office surgery,"[15] has a 24/7 emergency department providing emergency and critical care services that treats in excess of 50,000 patients per year,[16] and in its application to the Illinois Health Facilities and Services Review Board for a Certificate of Exemption for obstetric services Memorial represented that it has the ability to treat patients presenting to the emergency department in labor "in a safe and competent fashion."[17] Further, Memorial Hospital in Belleville is part of the same health system as Memorial Hospital in Shiloh, Illinois (8.2 miles away), which has a labor and delivery unit.[18] Nearby Gateway Regional Medical Center in Granite City, Illinois (16.7 miles

---

[14] Although this hospital, Touchette Hospital in Centreville, Illinois, said that it could not treat Ms. Farmer, given the circumstances, including that it instructed Ms. Farmer to go to nearby Memorial Hospital, Ms. Farmer is not naming this hospital as a Recipient in this complaint.
[15] MEMORIAL HOSPITAL, OB/GYN, https://memhosp.org/ob-gyn/ (last visited Jan. 26, 2023).
[16] MEMORIAL HOSPITAL, EMERGENCY SERVICES, https://memhosp.org/emergency/ (last visited Jan. 25, 2023).
[17]#E-038-20, ILLINOIS HEALTH FACILITIES & SERVICES REVIEW BOARD DISCONTINUATION APPLICATION FOR EXEMPTION, –MEMORIAL HOSPITAL, BELLEVILLE, at 37 (July 27, 2020), https://www2.illinois.gov/sites/hfsrb/Projects/Pages/Memorial-Hospital,-Belleville--E-038-20.aspx (last visited Jan. 26, 2023).
[18] *Id.* at 7, 29, 37.

away), also has a labor and delivery unit.[19] But Memorial Hospital did not inform Ms. Farmer of the availability of services at Memorial–Shiloh or Gateway Regional or direct her where else to go to get the emergency care she needed.

20. Ms. Farmer then began calling hospitals in Kansas. An employee at Labette Health in Parsons, Kansas, asked Ms. Farmer not to seek care at their emergency department because the hospital—which has a labor and delivery unit, has been designated a Level III trauma center, and boasts "[s]ome of the area's most experienced emergency medicine physicians, physician assistants, APRNs, registered nurses (RNs) and emergency department (ED) technicians," who "provide 24-hour care"[20]—is "small." The employee suggested that Ms. Farmer try calling hospitals in Wichita, which is an additional 2 hours from Joplin, Missouri.[21]

21. Ms. Farmer ultimately decided to travel to the University of Kansas Health System in Kansas City, Kansas, a three-hour drive from her home. When Ms. Farmer arrived at the emergency department of the main hospital campus of the University of Kansas Health System at 11:27 PM on August 2, 2022, she was immediately taken by wheelchair to a bed in the labor and delivery department.

---

[19] *Id.* at 29.

[20] LABETTE HOSPITAL, EMERGENCY SERVICES, https://www.labettehealth.com/services/emergency-services/; LABETTE HOSPITAL, LABOR AND DELIVERY, https://www.labettehealth.com/services/labor-delivery/.

[21] Ms. Farmer then contacted Wesley Woodlawn Hospital in Wichita, Kansas. Although this hospital also said they could not treat her, given the circumstances, including that the hospital advised her to go to University of Kansas Health System in Kansas City, which is approximately 30 minutes closer to her home in Joplin, Missouri, Ms. Farmer is not naming Wesley Woodlawn Hospital as a Recipient in this complaint.

22. Dr. Leslie Dunmire performed Ms. Farmer's physical exam shortly after midnight on August 3, 2022. Dr. Dunmire independently determined that Ms. Farmer had experienced PPROM and that her pregnancy was no longer viable.

23. While at the University of Kansas Health System, Ms. Farmer felt her symptoms worsen. Her fatigue grew more intense, she experienced mental fog, and the dull ache of cramping turned into more serious pain.

24. Dr. Dunmire recommended medical intervention due to the risks to Ms. Farmer's health and the nonviability of her pregnancy. Dr. Dunmire told Ms. Farmer that they could either induce labor or surgically end the pregnancy. Dr. Dunmire recommended inducing labor due to concerns that the surgical option would "resemble an abortion" and therefore might not be permitted by the hospital. Dr. Dunmire also advised that inducing labor would give Ms. Farmer the opportunity to hold her daughter and say goodbye. Ms. Farmer and her boyfriend desperately wanted that opportunity.

25. Nearly twenty minutes later, however, Dr. Dunmire returned to Ms. Farmer's bedside with devastating news: despite Dr. Dunmire's medical judgment, legal counsel for the University of Kansas Health System had determined that Dr. Dunmire could not provide *any* treatment, including inducing labor, because it would be "too risky in this heated political environment to intervene." Dr. Dunmire wrote in Ms. Farmer's medical records that she could not provide Ms. Farmer with care due to the positive fetal heart tone, and she urged

Ms. Farmer to seek care elsewhere because of "how quickly she could become ill from chorioamnionitis."

26. Ms. Farmer was discharged from the University of Kansas Health System at 1:29 AM on August 3, 2022. No medical provider at the University of Kansas Health System administered medication to Ms. Farmer for her pain or otherwise provided her with medical treatment.

27. Ms. Farmer and her boyfriend returned home on August 3 in a state of disbelief and terror that no doctor was willing to take the steps necessary to save Ms. Farmer's life, as well as grief for the inevitable loss of their daughter.

28. Without other apparent options, Ms. Farmer decided to follow Dr. Allison's advice from the day prior and return to Freeman Hospital West for monitoring overnight. Although Ms. Farmer conveyed Dr. Allison's instructions to hospital staff, the labor and delivery department initially refused to admit her. And even after admitting Ms. Farmer, doctors at Freeman Hospital West continued to refuse to induce Ms. Farmer's labor or otherwise medically intervene to resolve her pregnancy complications.

29. Overnight, Ms. Farmer was visited by a doctor from the NICU department who provided her with grim details about the fate of her pregnancy. Because her cervix was dilated and there was no amniotic fluid surrounding the fetus, the doctor affirmed that there was virtually no chance Ms. Farmer would be able to carry her pregnancy to a point when it would be viable. But as she continued to go without care, Ms. Farmer was told, her uterus was constricting around her

daughter, crushing her tender bones. The NICU doctor expressed to Ms. Farmer that "there are some fates worse than death." Nonetheless, the doctor offered no treatment to Ms. Farmer.

30. Other doctors who visited Ms. Farmer on the night of August 3 expressed frustration to her about their "inability" to help her or other women like her. They explained to Ms. Farmer that she was not the first woman who had been denied care since Missouri's abortion ban had gone into effect. They told Ms. Farmer that they feared women like her "would die" because they believed Missouri's abortion laws prevented them from providing the best care possible.

31. Ms. Farmer consistently told the medical providers at Freeman Hospital West that she desperately wanted to keep her daughter if she could, but she did not want to continue with a nonviable pregnancy that was putting her health and life at risk.

32. During this visit to Freeman Hospital West, Ms. Farmer was "beyond scared." Her pain had increased severely, but she was afraid to ask for medication because she did not want to be labeled a drug seeker. She was ultimately provided with some Tylenol and medication for anxiety.

33. Ms. Farmer remained at Freeman Hospital West until mid-morning on August 4, 2022. Although she was given the option of staying at the hospital for continued observation, Ms. Farmer felt pressured by staff to leave because they were not able to provide her with the care that they knew she needed. Leaving the

hospital, in addition to ongoing pain, fatigue, and mental fog, Ms. Farmer felt defeated and humiliated.

34. After returning home, Ms. Farmer learned that a clinic in Illinois would offer her urgent care if she could travel there by the next morning. Ms. Farmer and her boyfriend spent the evening figuring out how they could afford to travel so far and stay overnight, especially since they had only $45 available between them. During that time, Ms. Farmer felt fatigued and emotionally drained. Her bleeding began decreasing, but her pain and cramping were increasing. Ms. Farmer and her boyfriend tried to get a few hours' sleep before leaving their house at 3:00 AM on August 5, 2022, to begin the 4.5-hour journey north.

35. At around 4:00 AM, Ms. Farmer began to experience severe cramping, contractions, and back pain while in the car on the way to Illinois. Ms. Farmer decided to keep going—she did not want to go to any other emergency departments in Missouri because she did not trust that they would provide her with medically appropriate care.

36. By the time Ms. Farmer arrived at the clinic in Illinois at approximately 10:00 AM, she was in active labor and nearly fully dilated. The physician at the Illinois clinic was immediately able to perform a surgical procedure to end Ms. Farmer's pregnancy and eliminate the risk to her life and health.

37. Ms. Farmer was relieved and grateful that the Illinois clinic was able to provide her with the lifesaving care she needed. At the same time, though, she

was traumatized by the Recipients' refusals to provide her appropriate, critical medical care.

38. Over the next few days, Ms. Farmer continued to experience pain and vaginal discharge. Ms. Farmer contacted Dr. Allison, who prescribed a round of antibiotics because she said that Ms. Farmer likely had developed an infection during the delay in care.

39. Ms. Farmer and her boyfriend are experiencing serious financial, medical, and emotional hardships as a result of the Recipients' discrimination.

a. Ms. Farmer has not been able to afford to pay the bill she received from the University of Kansas Health System, and she is anxious that she soon will receive a bill from Freeman Hospital West. Ms. Farmer's former insurer refused to cover the costs of the care that she ultimately received from the clinic in Illinois.

b. Over the days during which she was denied care by the Recipients, Ms. Farmer missed work and was docked pay amounting to the equivalent of one paycheck. Ms. Farmer's boyfriend lost his job because he was forced to miss work to help Ms. Farmer travel to and from Freeman Hospital West, the University of Kansas Health System, and the clinic in Illinois. Ms. Farmer's boyfriend was unable to find new, steady employment in Missouri.

c. Because of their financial struggles and the couple's feeling that they were being ostracized in their community after the story of Ms. Farmer's pregnancy loss became public, Ms. Farmer and her boyfriend decided to move in with Ms. Farmer's sister in Oregon. They were able to take with them only their

belongings that would fit in a small U-Haul. Neither Ms. Farmer nor her boyfriend have found new full-time employment, and they are doing part-time delivery gigs to make ends meet. Because of the move and loss of employment, Ms. Farmer and her boyfriend lost their health insurance, so Ms. Farmer has had to forgo taking certain mental health medications that she had been prescribed to help with her depression related to her pregnancy loss.

d. Ms. Farmer also continues to suffer harm to her physical and mental health resulting from the mistreatment she experienced by the Recipients. She has been suffering severe bouts of nausea—at one point requiring her to be hospitalized—which she believes are related to the stress caused by these experiences. Further, while she continues to mourn the loss of her daughter, she cannot get her mind off the fact that other women are being forced to go through what she went through.

40. Ms. Farmer has lost faith in medical providers and institutions, and so she has avoided seeking treatment for other ongoing pain and health issues. Further, because of Recipients' mistreatment, Ms. Farmer made an emotionally difficult decision to obtain tubal ligation, to avoid the risk of future sex discrimination during pregnancy from health care providers and institutions.

41. Ms. Farmer is concerned that the Recipients are denying or discouraging other pregnant people from seeking emergency medical care, potentially risking those patients' health and life. Ms. Farmer never wants another pregnant person to face the same devastating discrimination that she faced.

## LEGAL ALLEGATIONS

42. Section 1557 provides broad federal protections against discrimination, including sex discrimination, in health care. In relevant part, Section 1557 states:

> [A]n individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.) …, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).[22]

43. Freeman Hospital West, Memorial Hospital, Labette Health, and the University of Kansas Health System are recipients of Federal financial assistance subject to Section 1557.

a. Section 1557 provides that any health program or activity, any part of which receives "Federal financial assistance," including in the forms of "credits, subsidies, or contracts of insurance," cannot discriminate on the basis of sex.[23] Medicare and Medicaid payments constitute Federal financial assistance under Section 1557.[24]

b. Freeman Hospital West, Memorial Hospital, Labette Health, and the University of Kansas Health System participate in Medicare and Medicaid.[25]

---

[22] 42 U.S.C. § 18116(a).

[23] *Id.*

[24] *See T.S. by and through T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 742–43 (7th Cir. 2022).

[25] *See* BILLING AND INSURANCE, FREEMAN HEALTH SYSTEM, https://www.freemanhealth.com/billing-and-insurance#964037043-1186226676; ACCEPTED INSURANCE PLANS, MEMORIAL HOSPITAL BELLEVILLE, https://memhosp.org/accepted-insurance-plans/; PRICING AND CHARGING, LABETTE HEALTH, https://www.labettehealth.com/patients-visitors/financial-services/pricing-and-charging/; INSURANCE COVERAGE, UNIVERSITY OF KANSAS HEALTH SYSTEM, https://www.kansashealthsystem.com/patient-visitor/financial/insurance/medicare-and-medicaid.

44. Freeman Hospital West, Memorial Hospital, Labette Health, and the University of Kansas Health System are "health program[s] or activities" subject to Section 1557.[26]

45. The Recipients' refusal to provide Ms. Farmer emergency abortion care constituted discrimination on the basis of sex, in violation of Section 1557.

a. As the Department has repeatedly acknowledged, Section 1557 bars discrimination based on "pregnancy or related conditions," including based on termination of pregnancy.[27] Section 1557 incorporates the "grounds prohibited" under Title IX, including its longstanding prohibition against discrimination on the basis of "pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom."[28] Additionally, federal courts have long held that Title IX[29] and Title VII[30] bar discrimination on the basis of pregnancy and related conditions, including abortion.

b. Section 1557's prohibition on sex discrimination requires that a covered entity provide emergency abortion care if the entity otherwise offers comprehensive emergency care and has the competency to provide comparable gynecologic or obstetric care. When a health program is competent to provide it,

---

[26] *See* 42 U.S.C. § 18116(a).
[27] *See, e.g.*, *Guidance to Nation's Retail Pharmacies*, *supra* note 3, at 3.
[28] 34 C.F.R. § 106.40(b)(1).
[29] *See, e.g.*, *Conley v. Northwest Fla. State Coll.*, 145 F. Supp. 2d 1073, 1076–85 (N.D. Fla. 2015); *Chipman v. Grant Cty. Sch. Dist.*, 30 F. Supp. 2d 975, 977-78 (E.D. Ky. 1998); *Wort v. Vierling*, No. 82–3169, slip op. (C.D.Ill. Sept. 4, 1984), *aff'd on other grounds*, 778 F.2d 1233 (7th Cir.1985).
[30] *See, e.g.*, *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir.), *order clarified*, 543 F.3d 178 (3d Cir. 2008); *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211 (6th Cir. 1996) *Ducharme v. Crescent City Deja Vu, L.L.C.*, 406 F. Supp. 3d 548, 556 (E.D. La. May 13, 2019) ("The conclusion that an abortion is protected by the pregnancy language of Title VII is consistent with the only two courts of appeals to have ruled on the issue.").

refusing to provide a type of medical care that only individuals with protected characteristics need is discriminatory. For example, under Title VII, an employer may not choose to offer an employee health benefit plan that excludes coverage for services that are available only to people capable of pregnancy, like prescription contraceptives.[31] Similarly, many courts have determined that it is discriminatory to exclude coverage for surgeries needed to treat gender dysphoria that would be covered for other reasons, like treating cancer or menopause.[32] For these reasons, a health program may not single out for unfavorable treatment a necessary medical intervention, like emergency abortion care, that only people with protected sex characteristics, like pregnant people, need.

c. Sex discrimination based on abortion is rooted in stereotypes ascribing negative attributes to women and people capable of pregnancy "who seek to terminate a pregnancy[,] mark[ing] them [as] internally or externally… inferior to ideals of womanhood."[33] Abortion stigma perpetuates sex-based stereotypes that women are inherently maternal and biologically wired to desire—above all else—to

---

[31] *See, e.g.*, *Cooley v. DaimlerChrysler Corp.*, 281 F. Supp. 2d 979, 984 (E.D. Mo. 2003); *Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1270–71 (W.D. Wash. 2001); U.S. Equal Employment Opportunity Comm'n, *Commission Decision on Coverage of Contraception* (Dec. 14, 2000), http://www.eeoc.gov/policy/docs/decision-contraception.html (explaining that failure to cover prescription contraception in an otherwise comprehensive prescription drug plan constitutes sex discrimination in violation of Title VII). As the EEOC has explained, the Eighth Circuit's decision in *In re Union Pac. R.R. Employment Practices Litig.*, 479 F.3d 936, 942 (8th Cir. 2007), that contraception is not "related to pregnancy" is not persuasive because it is contrary to the Supreme Court's holding in *Johnson Controls* that the PDA applies to potential pregnancy. *See* U.S. Equal Emp't Opportunity Comm'n, *Enforcement Guidance: Pregnancy Discrimination and Related Issues*, at *7 n.38 (June 25, 2015).

[32] *See, e.g.*, *Lange v. Houston Country, Georgia*, --- F. Supp. 3d ----, 2022 WL 1812306, at *10–14 (M.D. Ga. June 2, 2022),

[33] Anuradha Kumar et al., *Conceptualizing Abortion Stigma*, 11 CULTURE, HEALTH & SEXUALITY 625, 628–29 (2009) [hereinafter *Conceptualizing Abortion Stigma*].

birth children and fulfill traditional roles as caretakers within the nuclear family structure.[34] Studies have found that negative sex-based stereotypes perpetuated by abortion stigma include notions that those who seek abortions are sexually promiscuous, selfish, immoral for engaging in "nonprocreative" sex, or irresponsible in failing to "contracept effectively."[35] Notably, these same stereotypes are not commonly attributed to men who engage in "nonprocreative" sex.[36] Sex-based abortion stigma has been shown to lead to discriminatory actions by medical professionals serving people who have had or need abortion care.[37]

d. The Recipient hospitals typically treat all who present with emergency medical conditions when such treatment is within their competency, as required by federal law.[38] Upon information and belief, each of the Recipient hospitals had the competency to provide emergency abortion care to Ms. Farmer.[39] Yet the Recipients

---

[34] Alison Norris et al., *Abortion Stigma: A Reconceptualization of Constituents, Causes, and Consequences*, 21 WOMEN'S HEALTH ISSUES 1, 6 (2011), https://www.whijournal.com/article/S1049-3867(11)00033-8/fulltext [hereinafter Norris *Abortion Stigma*]; *Conceptualizing Abortion Stigma*, *supra* note 33, at 628–29. Abortion stigma also stems from a universal misperception that abortion is an immoral act as opposed to a personal medical decision, and it is experienced by a majority of people seeking abortion. *See* Kate Cockrill. et al., *Addressing Abortion Stigma Through Service Delivery: A White Paper* 17 (2013), https://www.ibisreproductivehealth.org/publications/addressing-abortion-stigma-through-service-delivery-white-paper; Paula Abrams, *The Scarlet Letter: The Supreme Court and the Language of Abortion Stigma*, 19 MICH. J. GENDER & L. 293, 328–29 (2013); M. ANTONIA BIGG ET AL., PERCEIVED ABORTION STIGMA AND PSYCHOLOGICAL WELL-BEING OVER FIVE YEARS AFTER RECEIVING OR BEING DENIED AN ABORTION 2 (Whitney S. Rice ed., 2020) (finding that most people considering abortion perceive some stigma related to their decision).

[35] Norris *Abortion Stigma*, *supra* note 34, at 6, 7.

[36] *Id.* (citing Nancy Felipe Russo, *The Motherhood Mandate*, J. SOCIAL ISSUES, 32, 143–153 (1976)).

[37] *See* Kate Cockrill & Adina Nack, *"I'm Not That Type of Person": Managing the Stigma of Having an Abortion*, 34 DEVIANT BEHAV. 973, 981 (2013).

[38] *See* 42 U.S.C. § 1395dd(a), (b)(1); EMTALA Guidance, *supra* note 5, at 4 (requiring the provision of "dilation and curettage (D&C)" or otherwise medically or surgically intervening to end a pregnancy of a patient experiencing emergency pregnancy complications).

[39] The Department recently stated that Section 1557 does not require health care professionals to perform services outside of their normal specialty. *See* Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824, 47,866 (proposed August 4, 2022) (to be codified at 45 C.F.R.

denied Ms. Farmer that care while she was experiencing an emergency related to her pregnancy, and none even bothered to tell Ms. Farmer where else she could go. Indeed, upon information and belief, each Recipient hospital has a policy or practice of treating pregnant patients needing emergency abortion care differently from other patients presenting with emergency health conditions on the basis of sex, subjecting them to substantial harm.[40] This constitutes unlawful sex discrimination in violation of Section 1557 of the ACA.

46. The fact that Ms. Farmer only called but did not present at Memorial Hospital and Labette Health does not change the fact that their refusal to treat her violated Section 1557. A hospital violates Section 1557's protections against sex discrimination when it urges a patient experiencing pregnancy complications not to seek care at its emergency department just because that care may ultimately require the termination of a pregnancy.

a. Discouraging an individual from seeking a service or opportunity because of the individual's protected characteristic is a well-established form of unlawful discrimination. For example, Title VII[41] prohibits employers from discouraging applications by potential employees because they possess certain

---

§ 92.206(b)(2)). Abortion care is "among the array of services that make up Gynecological Care," *see* ACOG Guidelines, *supra* note 5, and Memorial–Belleville operates a gynecological department, *see supra* note 15. Further, even if the Department concludes that, without a labor and delivery unit, Memorial Hospital did not have the competency to provide Ms. Farmer's emergency abortion care, Memorial Hospital still would have had the obligation under federal law to stabilize and transfer her had she presented to their emergency department. *See* 42 U.S.C. § 1395dd(b)(1), (c).

[40] *See supra* ¶¶ 14–15, 19–20, 24–25, 30.

[41] *See* 42 U.S.C. § 2000e-2(a)(2).

protected characteristics, and the Fair Housing Act[42] prohibits landlords from discouraging rental applications from potential tenants because they possess certain protected characteristics.[43]

b. Similarly, in the health care context, a hospital violates Section 1557's protections against sex discrimination when it discourages a patient from seeking care it is competent to provide based on a patient's sex-based characteristics, such as the patient's need to terminate a pregnancy.[44]

c. Recipients Memorial Hospital and Labette Health further discriminated against Ms. Farmer by refusing to offer her information on where else she could go to obtain the vital care she needed, leaving her on her own to call hospitals during an emergency.

47. When it comes to emergency abortion care, Section 1557's requirements apply without exception.

a. Section 1557 contains one exemption—"except as otherwise provided for [under Title I of the ACA]."[45] Nothing incorporated by this clause permits the

---

[42] *See* 42 U.S.C. § 3604(d).

[43] Title IX does not include a similar provision because it was intentionally drafted broadly, and the Supreme Court has consistently instructed that Title IX must be read to "sweep as broad as its language," *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982) (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 180 (2005); *Davis Next Friend LaShaonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992).

[44] Indeed, as already discussed, the Recipients would have been obligated to provide Ms. Farmer with some form of emergency medical treatment under EMTALA. *See* EMTALA Guidance, *supra* note 5, at 4. Discouraging a subset of patients entitled to EMTALA's protections from seeking emergency treatment because they are pregnant and may require termination is a form of sex discrimination and thus violates Section 1557.

[45] 42 U.S.C. 18116(a). Because the only exceptions that apply to Section 1557 are those "otherwise provided for" in Section I of the ACA, Title IX's abortion and religious exemption are no exception. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1, 43

refusals of abortion care in the emergency circumstances experienced by Ms. Farmer.[46]

b. Additionally, Section 1557 must be interpreted in accordance with its intent "to expand access to care and coverage and eliminate barriers to access..." as the government has a "compelling interest in ensuring that individuals have nondiscriminatory access to healthcare...."[47] No person should be forced to do extensive research in an emergency to determine where they will be able to find lifesaving medical care free from discrimination. When medical providers refuse to provide emergency abortion care, pregnant people are forced into dangerous situations resulting from discrimination based on sex, and patients' overall trust in medical institutions is eroded.

48. To the extent that applicable state laws would have prohibited Ms. Farmer's care and thereby directly conflict with Section 1557, the federal law preempts.[48]

---

(D.D.C. 2020) (holding plaintiffs were likely to succeed on claim that Section 1557 does not incorporate Title IX's religious exemption).

[46] Although Section 1303 of the ACA incorporates into Section 1557 harmful federal laws that allow certain entities to refuse to provide abortion care in limited situations—the Weldon, Church, and Coats-Snowe Amendments, 42 U.S.C. § 18023(c)(2)—Section 1303 itself clarifies that its application of refusal laws excludes emergency care. *See* 42 U.S.C. § 18023(d) ("Nothing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law," including Section 1557 itself, EMTALA, and other laws prohibiting discrimination in health care, denials of emergency care, and medical malpractice, among others); *cf. New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 538 (S.D.N.Y. 2019) (explaining that the refusal statutes yield to EMTALA). And in any event, none of the hospitals cited a religious or moral objection to providing Ms. Farmer the care she needed.

[47] Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,377, 31,380 (May 18, 2016).

[48] *See* 42 U.S.C. § 18041(d).

a. Generally, state laws are preempted where compliance would force covered health care entities to thwart Congress's fundamental purpose of prohibiting sex discrimination in health care by violating Section 1557.[49] The ACA's narrow non-preemption provision exempting "State laws regarding the prohibition of (or requirement of) coverage, funding, or procedural requirements on abortions,"[50] does not apply to state laws prohibiting emergency abortion care.

b. To the extent any covered entity refused to treat Ms. Farmer's emergency pregnancy complications because it believed a state law prohibited it from providing emergency abortion care, compliance with a discriminatory state law is no defense to a federal violation.[51]

**RELIEF REQUESTED**

49. Ms. Farmer requests that OCR:

a. Investigate Freeman Hospital West, Memorial Hospital, Labette Health, and the University of Kansas Health System for Section 1557 violations of sex discrimination arising from their refusal to provide Ms. Farmer with the abortion care necessary to preserve her life and health on August 2–4, 2022;

b. Take all necessary steps to secure an end to discriminatory policies or practices based on sex identified in its investigation of Freeman Hospital West,

---

[49] *See Arizona v. United States*, 567 U.S. 387, 399 (2012).

[50] *See* 42 U.S.C. § 18023(c)(1).

[51] In addition to Section 1557 itself, EMTALA also preempts any state law with which it conflicts. *See* 42 U.S.C. § 1395dd(f) (stating that EMTALA preempts state law "to the extent that the [state law] requirement directly conflicts with a requirement of this section"); *United States v. Idaho*, --- F. Supp. 3d ----, No. 1:22-cv-00329-BLW, 2022 WL 3692618, at *8–14 (D. Idaho Aug. 24, 2022) (holding that Idaho Code § 18-622—which, like Missouri Code § 188.017 criminalizes performing an abortion with a narrow affirmative defense for medical emergencies—would make it impossible for physicians to comply with EMTALA and frustrate EMTALA's purpose by deterring abortion care).

Memorial Hospital, Labette Health, and the University of Kansas Health System, including by imposing all appropriate penalties and by obtaining assurances that all entities will comply with Section 1557;

c. Monitor any resulting agreements with Freeman Hospital West, Memorial Hospital, Labette Health, and the University of Kansas Health System to ensure that compliance with Section 1557 is achieved; and,

d. Provide Ms. Farmer with such other relief as is appropriate.

Respectfully submitted,

Michelle Banker

---

Michelle Banker
Alison Tanner
Sunu Chandy
Kelly Frye
Bridget Winkler
National Women's Law Center
11 Dupont Circle N.W., Suite 800
Washington, D.C. 20036
202-588-7602
mbanker@nwlc.org
atanner@nwlc.org

Date: January 29, 2023