IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MYLISSA FARMER,

    Plaintiff,

    v.

UNIVERSITY OF KANSAS HOSPITAL
AUTHORITY,

    Defendant.

Case No. 2:24-cv-02335-HLT-BGS

**MEMORANDUM AND ORDER**

This is an Emergency Medical Treatment and Labor Act ("EMTALA") and Kansas Act Against Discrimination ("KAAD") discrimination case.[1] It involves Defendant University of Kansas Hospital Authority's alleged failure to properly screen and stabilize Plaintiff's premature rupture of membranes ("PPROM") condition. Plaintiff Mylissa Farmer was seventeen weeks pregnant and came to Defendant's emergency room after she experienced loss of all her amniotic fluid. Plaintiff alleges that although some screening occurred, including an ultrasound, Defendant deviated from its screening protocols by failing to take her temperature and conduct a pain assessment. Plaintiff also alleges Defendant failed to stabilize her medical condition and unlawfully discriminated against her by discharging her without inducing labor because of political conditions in Kansas at the time.

Defendant moves to dismiss (Doc. 18). Defendant argues that Plaintiff's failure-to-screen and stabilize claims are logically inconsistent, the alleged screening failures were de minimis,

---

[1] This case is about EMTALA and state-law discrimination. The heated rhetoric in the filings suggests the parties view this case differently. The parties are generally free to litigate the case as they see fit, but the Court cautions the parties that it will not view favorably excessively dramatic and bombastic rhetoric in future filings because it is counterproductive to the just and efficient resolution of this case.

Plaintiff's condition was not an emergency condition, and at no point did her condition become unstable. Defendant also argues that it did not violate the KAAD because discrimination based on pregnancy is not unlawful under the KAAD.

Defendant's arguments do not warrant dismissal. The Court denies Defendant's motion.

I.   **BACKGROUND**[2]

Plaintiff was seventeen weeks pregnant on August 2, 2022, when her water broke. Her obstetrician-gynecologist told her to go to the emergency department at Freeman Hospital West in Joplin, Missouri. This facility was close to Plaintiff's home. The doctors at Freeman determined she had experienced previable PPROM, her cervix was dilated, and she had lost all amniotic fluid. The Freeman doctors concluded the loss of her pregnancy was inevitable. Because of her medical history, waiting to end her pregnancy would put Plaintiff at risk of maternal thrombosis, infection/sepsis, severe blood loss, the loss of her uterus, and death. The Freeman doctors claimed they could not terminate Plaintiff's pregnancy because of Missouri's abortion ban and told her to seek care at an out-of-state emergency department.

Plaintiff sought care out of state. She called providers in Kansas and Illinois. The Kansas providers recommended she go to Defendant's hospital in Kansas City, Kansas, because it was the closest large emergency department. It was a three-hour drive away.

Plaintiff arrived at Defendant's emergency department around 11:30 p.m. on August 2, 2022. She was taken to the labor and delivery unit by wheelchair and disrobed. She had

---

[2]   The following background facts are drawn from Plaintiff's complaint. Their truth is assumed. Defendant attaches multiple documents to its motion and asks the Court to consider them. These documents appear to relate to administrative proceedings. These documents suggest that the facts of this case might be more nuanced than the complaint suggests. Even so, the Court does not consider them. The Court generally cannot consider materials beyond the complaint when evaluating a Rule 12(b)(6) motion to dismiss unless the outside documents are subject to judicial notice (including documents that are a matter of public record), *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006), or the documents are indisputably authentic and are central to and referenced in the complaint, *GFF Corp. v. Assoc. Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997). Neither situation is present, so the Court limits its review to the well-pleaded facts in the complaint.

been bleeding. Defendant determined Plaintiff's medical history included deep vein thrombosis, an irregular heartbeat, and polycystic ovary syndrome. Plaintiff was also over 35 years old, which constitutes advanced maternal age. Plaintiff continued to bleed. And her bleeding was at its heaviest while at Defendant's hospital. She grew fatigued, experienced mental fog, and felt acute pain and pressure in her lower abdomen.

Defendant's OB Triage Care guidelines require hospital staff to perform a pain assessment on emergency obstetric patients and to take their temperature at least upon presentation to triage. Defendant's PPROM guidelines also require a PPROM patient's temperature be taken. Defendant's guidelines indicate that there is an increasing risk of complications the earlier and longer membranes are ruptured for PPROM patients. PPROM carries with it the risk of infection due to the breach of the natural barrier that the amniotic membrane provides, as well as the close proximity of vaginal and fecal bacteria. Placental abruption also complicates PPROM, placing the mother and fetus at risk for hemorrhage, hypoxia, and death. Defendant's guidelines also state that when PPROM occurs before viability (twenty-three to twenty-four weeks' gestation), the provider ought to explain the risks and benefits of outpatient expectant management and surveillance and offer immediate delivery. In the event a PPROM patient declines immediate delivery, the hospital should admit the patient to an antenatal unit for monitoring for infection and fetal well-being and administer antibiotic prophylaxis.

Defendant's providers didn't provide Plaintiff with either a pain assessment or take her temperature. The physician treating Defendant—Dr. Leslie Dunmire—did, however, independently confirm Plaintiff had experienced PPROM and that her pregnancy was no longer viable. Dr. Dunmire performed a bedside ultrasound and confirmed that Plaintiff's pregnancy was anhydramnios, which meant there was no longer any amniotic fluid surrounding the fetus. Dr.

Dunmire determined that Plaintiff's cervix was dilated. Plaintiff alleges she was so vulnerable to infection that Dr. Dunmire did not perform a transvaginal ultrasound or examine Plaintiff digitally. But a fetal heartbeat was detected.

Dr. Dunmire recommended to Plaintiff that she terminate her pregnancy because of the risks to Plaintiff's health from PPROM and because her fetus was nonviable. Dr. Dunmire presented two options: a dilation and evacuation ("D&E") or induction of labor. Dr. Dunmire told Plaintiff that a D&E would resemble an abortion. Dr. Dunmire recommended inducing labor. Inducing labor, Dr. Dunmire explained, would also give Plaintiff an opportunity to hold her daughter and say goodbye.

Shortly after, Dr. Dunmire told Plaintiff that induction was no longer an option because it would be too risky in the heated political environment. The evening Plaintiff arrived at Defendant's hospital was the night of the 2022 primary elections in Kansas and a state constitutional amendment concerning abortion access was on the ballot. Dr. Dunmire told Plaintiff that she could become ill from an intraamniotic infection but that it was not possible to provide Plaintiff with necessary preventative treatment because of the detectable fetal heartbeat. Defendant refused to induce labor and did not offer to admit Plaintiff to an antenatal unit for monitoring for infection or further deterioration of her health. Defendant also did not administer prophylactic antibiotics or pain medication. Defendant discharged Plaintiff around 1:30 a.m. on August 3, approximately two hours after she arrived.

Plaintiff was subsequently admitted to a hospital in Joplin, Missouri. She was admitted for observation, and her health continued to deteriorate. Plaintiff left the hospital in Joplin on August 4 and traveled to a clinic in Illinois. A D&E was performed at that facility to terminate the pregnancy. Plaintiff alleges she likely suffered an infection due to the delay in terminating her pregnancy,

which prolonged her recovery. Plaintiff also suffered labor pain and was psychologically traumatized by Defendant's declination to provide her with care. Plaintiff feared she could die from her condition. Plaintiff alleges that trauma from the event has exacerbated a chronic illness and resulted in her hospitalization on several occasions. Plaintiff also alleges that the psychological trauma of the event prevented Plaintiff from working for several months, which ultimately resulted in the loss of her home.

Plaintiff's experience as a PPROM patient was different from the experience of another patient seen at Defendant's hospital several weeks earlier. The other patient received a pain assessment and had her temperature taken.

## II.    LEGAL STANDARD

A complaint survives a Rule 12(b)(6) motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation and citation omitted). A plausible claim is one with enough facts for the court to infer "the defendant is liable for the misconduct alleged." *Id.* Plausibility means "more than a sheer possibility," but it "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation and citation omitted). On a motion to dismiss, a court ignores a complaint's legal conclusions and assumes the truth of the complaint's well-pleaded non-conclusory factual allegations *Id.* at 678-79. It also draws all reasonable inferences from those allegations in the plaintiff's favor. *Dyno Nobel v. Steadfast Ins. Co.*, 85 F.4th 1018, 1025 (10th Cir. 2023).

### III.  ANALYSIS

Defendant moves to dismiss Plaintiff's EMTALA claims for failures to screen and stabilize as well as her state-law claim for discrimination. Defendant argues that Plaintiff's failure-to-screen and failure-to-stabilize claims are logically inconsistent and that the alleged deficiencies in its screening of Plaintiff were de minimis. Defendant argues that it did not fail to stabilize Plaintiff's condition because it was not an emergency medical condition and because it never became unstable. Finally, Defendant argues that it is not unlawful to discriminate against someone because of pregnancy status under KAAD. The Court does not find Defendant's arguments persuasive and therefore denies the motion to dismiss.

#### A.  Failure to Screen

Defendant argues that Plaintiff fails to state an EMTALA failure-to-screen claim for two reasons: (1) Plaintiff's failure-to-screen and failure-to-stabilize claims are inherently contradictory because Defendant provided Plaintiff with an examination, correctly diagnosed Plaintiff with PPROM, and monitored her, and (2) any of its deviations from its standard emergency triage protocols for OB patients and for patients exhibiting symptoms of PPROM were de minimis. The Court rejects both arguments.

Defendant's first argument is a nonstarter because it's based on a misunderstanding of EMTALA's screening requirement. Defendant assumes any examination that reaches a correct diagnosis is sufficient to satisfy EMTALA. This is not right.[3] Liability for a failure to screen under EMTALA can still attach even if some screening examination has been conducted and a correct diagnosis arrived at. This is because EMTALA requires that examination be "appropriate." 42

---

[3] Nor is it clear that the conditions Plaintiff claims Defendant failed to appropriately screen for are the same ones with which she was diagnosed.

U.S.C. § 1395dd(a). An "appropriate medical screening" is one where a hospital adheres to its own uniformly applied screening procedures. *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522-23 (10th Cir. 1994).[4] The correctness or incorrectness of a patient's diagnosis is not, itself, dispositive of whether the examination itself was "appropriate." *See Blake v. Richardson*, 1999 WL 319082, at *2-3 (D. Kan. 1999) (finding that alleged deviations from uniformly applied screening procedure could support a failure-to-screen claim under EMTALA notwithstanding the correctness of the diagnosis and subsequent treatment); *see also Cervantes v. Tenet Hosp. Ltd.*, 372 F. Supp. 3d 486, 493-95 (W.D. Tex. 2019) (collecting cases and observing that a correct diagnosis and post-examination hospital admission and treatment did not immunize a defendant from liability for inadequate screening under EMTALA).

Here, Plaintiff alleges Defendant failed to follow its own emergency OB triage and PPROM screening procedures. Plaintiff alleges Defendant followed those same procedures with another medically similar patient just weeks before. Plaintiff's allegations that Defendant "fail[ed] to treat her equally to individuals perceived to have the same condition . . . present[ ] the cornerstone of an EMTALA screening claim." *Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 717 F.3d 63, 71 (1st Cir. 2013) (quotation marks omitted) (discussing *Vickers v. Nash Gen. Hosp.*, 78 F.3d 139 (4th Cir. 1996)).

Defendant's second argument—that any deviations from protocols were de minimis—fails because it demands too much of Plaintiff at the pleading stage. Plaintiff's complaint alleges differences between the medical screening examination it gave Plaintiff and its standard protocols. Defendant acknowledges this but argues these differences were so slight that they were de minimis.

---

[4] This makes sense because EMTALA does not regulate substantive medical decision-making. It is not a federal medical malpractice statute. *Collins v. DePaul Hosp.*, 963 F.2d 303, 306-07 (10th Cir. 1992). Instead, EMTALA exists to ensure that all patients who are similarly situated from a medical perspective receive the same level of treatment. *Palmer v. Shawnee Mission Med. Ctr., Inc.*, 2017 WL 5629624, at *5-6 (D. Kan. 2017).

Defendant is correct that if the differences were de minimis then they can't support a failure to screen claim. *Repp*, 43 F.3d at 522-23. But, at the pleading stage, Plaintiff need only allege nonconclusory facts that, if true, would plausibly entitle her to relief.

Plaintiff's complaint clears this hurdle. Differences are "de minimis" if they formally deviate from the hospital's screening protocol but don't impact the screening's substance. An example is when a hospital fails to get a medical history with a list of medications that patient is taking as required by the screening protocol but the same information was communicated through other means. *See id.* In such a case, the difference is likely a purely formal one. *See id.* Here, evidence adduced in discovery might show that the variances Plaintiff identifies were purely formal. Then again, it might not. At this point, Plaintiff's allegations are just that—allegations. And the Court is bound to assume their truth when evaluating the sufficiency of Plaintiff's claim. The Court is also bound to afford Plaintiff all reasonable inferences it can from her complaint's allegations. When it does so here, it's at least plausible that Defendant's failure to take Plaintiff's temperature and conduct a pain assessment were more than de minimis deviations from Defendant's screening examination protocols. The Court denies Defendant's motion to dismiss Plaintiff's failure-to-screen claim.

  **B.**  **Failure to Stabilize**

Defendant argues that Plaintiff's failure-to-stabilize claim should be dismissed because Plaintiff has not alleged she had an emergency medical condition that was unstable. According to Defendant, Plaintiff's complaint neither alleges that her medical condition had actually become "unstable" while at Defendant's hospital nor that her condition was an "emergency" while she was at the hospital. Defendant argues Plaintiff has therefore failed to state a plausible claim for failure to stabilize.

The Court is not persuaded. EMTALA says that for anyone who comes to a hospital and is determined to have an "emergency medical condition," the hospital must either "stabilize" the condition or satisfy certain prerequisites before providing for the patient's transfer to another medical facility. 42 U.S.C. § 1395dd(b)(1). The terms "emergency medical condition," "to stabilize," and "stabilized," have specialized meanings under EMTALA. *Id.* §§ 1395dd(e)(1), (3). An emergency medical condition is one in which "the absence of immediate medical attention" might "reasonably be expected" to put the patient's health in serious jeopardy, result in "serious impairment to bodily functions," or result in "serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1). A "stabilized" emergency medical condition is one where "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the [patient's] transfer . . . ." *Id.* § 1395dd(e)(3)(B). And "to stabilize" an emergency medical condition means that the hospital does enough to "assure" itself that the condition is stabilized. *Id.* § 1395dd(e)(3)(A).

Defendant's argument that Plaintiff did not have an emergency medical condition does not meaningfully engage with that term's statutory definition. An emergency medical condition under EMTALA is defined in terms of risk, not certainty. Plaintiff does not have to allege she actually suffered from the complications of PPROM at that time. She only needs to allege enough facts for it to be plausible that serious impairment or jeopardized health might reasonably be expected without immediate medical intervention. Plaintiff does this. Plaintiff alleges that waiting to end her pregnancy put her at risk of maternal thrombosis, infection/sepsis, severe blood loss, the loss of her uterus, and death. Plaintiff alleges that absent "necessary" induction of labor, she would have been at risk of fatal infection, blood clot, or hemorrhage and that the risk of possible complications would increase over time without intervention. Assuming the truth of these

allegations (as the Court must), Plaintiff plausibly alleges her PPROM presented an emergency medical condition.

Plaintiff also plausibly alleges Defendant failed to stabilize her condition before discharging her. Defendant argues that it could not have failed to stabilize Plaintiff because at no time was she "unstable." Defendant insists that Plaintiff's condition while at the hospital was "normal" and that certain complications had not manifested. But these things are beside the point. Plaintiff need only allege enough facts to make it plausible Defendant didn't provide enough treatment to assure that it was unlikely that her condition would deteriorate during or because of her discharge. Plaintiff has done so. Plaintiff alleges that induced labor was the necessary treatment for her PPROM. Plaintiff alleges Defendant refused to provide her with that treatment. Plaintiff alleges Defendant "did not offer" admission to "an antenatal unit for monitoring" and did not "administer[ ] prophylactic antibiotics or pain medication." Plaintiff further alleges that Defendant discharged her. Plaintiff alleges that without necessary treatment she remained at risk for the complications that made her PPROM an emergency medical condition. Again assuming the truth of Plaintiff's allegations, the Court concludes Plaintiff plausibly alleges that Defendant failed to stabilize her emergency medical condition before discharging her.

### C. State-Law Discrimination

Defendant also urges dismissal of Plaintiff's claim under the Kansas Act Against Discrimination. Defendant makes a single argument. Relying on *Harder v. Kansas Commission on Civil Rights*, 592 P.2d 456 (Kan. 1979), Defendant contends it is not unlawful under the KAAD for a hospital to discriminate against a woman because she's pregnant. According to Defendant, "pregnancy" is not a category protected by the KAAD. Plaintiff responds that *Harder* does not support Defendant's position. Plaintiff further notes that employment regulations promulgated by

the Kansas Human Rights Commission under the KAAD prohibit pregnancy discrimination.[5] Plaintiff has the better of the arguments.

Defendant is correct that *Harder* expresses approval of the United States Supreme Court's opinions in *Geduldig v. Aiello*, 417 U.S. 484 (1974), and *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), holding respectively that discrimination based on pregnancy did not violate the 14th Amendment's Equal Protection Clause and was not unlawful sex discrimination under Title VII of the Civil Rights Act. But it's a mistake to read *Harder* as, itself, holding that the KAAD does not prohibit pregnancy discrimination as a form of sex discrimination. *Harder* found that Kansas Human Rights Commission regulations, which prohibited pregnancy discrimination in the employment context under KAAD, did not have retroactive effect. *Id. Harder* expressed no reservation about applying the new regulations prospectively. *Id.* It also acknowledged that they had the force of law. *Id.* at 559.

Defendant's argument that Plaintiff's KAAD claim should be dismissed under *Harder* is not persuasive. Defendant's motion to dismiss is denied.[6]

---

[5] Plaintiff further contends that if *Harder* is read to endorse the lawfulness of pregnancy discrimination, it's nearly impossible to square with the Kansas Supreme Court's later discussion in *Kansas Gas and Electric Co. v. Kansas Commission on Civil Rights*, 750 P.2d 1055 (Kan. 1988), of the benefits flowing from the KAAD's prohibition of pregnancy discrimination. The Court doesn't reach this argument. But it does note that the Kansas Supreme Court's opinion in *Kansas Gas & Electric,* only indirectly supports through dicta the conclusion that the KAAD forbids pregnancy discrimination.

[6] The Court does not accept Defendant's argument that pregnancy discrimination is permissible based on *Harder*. But it does question the coherence of Plaintiff's KAAD claim. Plaintiff's discrimination claim references both sex and pregnancy as the protected category. The parties vacillate between and conflate the two, which confuses the issue. Plaintiff will also ultimately be tasked with showing disparate treatment between herself and others who are similarly situated based on one or both of these traits, and the Court questions whether that can be accomplished under the facts and circumstances alleged, or whether a public accommodation discrimination claim is even proper in this context. But Defendant does not raise these issues, and the parties have not briefed them. The Court is limited to the arguments in the briefs, and as discussed above, Defendant's argument does not warrant dismissal of this claim.

## IV. CONCLUSION

The Court denies Defendant's motion to dismiss (Doc. 18). The bases for Defendant's motion do not undermine the plausibility of Plaintiff's complaint when the Court assumes the truth of the complaint's allegations.

THE COURT THEREFORE ORDERS that Defendant's Rule 12(b)(6) motion (Doc. 18) is DENIED.

IT IS SO ORDERED.

Dated: January 13, 2025                             /s/ *Holly L. Teeter*
                                                                                     HOLLY L. TEETER
                                                                                     UNITED STATES DISTRICT JUDGE